**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John M. GANTLEY, Defendant–
Appellant.**

No. 97–6027.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 26, 1998.

Decided March 30, 1999.

David J. Guarnieri (argued and briefed), Johnson, Judy, True & Guarnieri, LLP, Frankfort, Kentucky, for Defendant–Appellant.

Charles P. Wisdom, Jr. (argued and briefed), Office of the U.S. Attorney, Lexington, Kentucky, for Plaintiff–Appellee.

Before: JONES and COLE, Circuit Judges; O'MALLEY, District Judge.*

* The Honorable Kathleen O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

O'MALLEY, D.J., delivered the opinion of the court, in which COLE, J., joined. NATHANIEL R. JONES, J. (pp. 431–32), delivered a separate concurring opinion.

O'MALLEY, District Judge.

Defendant-appellant John Gantley brings this interlocutory appeal challenging the district court's judgment denying a motion to dismiss a criminal information on grounds of double jeopardy. Because we conclude the district court's judgment was not in error, we AFFIRM and remand this case for trial.

### I. Facts.

On December 23, 1996, the government filed a criminal information against defendant-appellant John Gantley, charging him with violating the Fair Credit Reporting Act, 15 U.S.C. § 1681(q), by posing as a paralegal to obtain credit information on several individuals. On May 27, 1997, the matter proceeded to trial in front of the Honorable Karl S. Forester. Toward the end of the first day of trial, Gantley moved the district court to admit the results of a polygraph examination he had taken voluntarily. Judge Forester denied the motion. The parties completed the presentation of their cases and the jury began deliberations on the afternoon of May 28, 1997. After more than a full day of deliberations, the jury declared itself hopelessly deadlocked. Judge Forester declared a mistrial and set the matter down for retrial to begin June 23, 1997.

The second trial began as scheduled. Early on June 23, 1997, Gantley again moved the district court to admit the results of his voluntary polygraph examination, and the district court again denied this motion. The parties then completed voir dire and opening statements, and the

government completed the presentation of its case.

Gantley began the presentation of his case on the morning of June 24, 1997 by taking the witness stand. After Gantley completed his testimony on direct examination, the government's attorney, Mr. Taylor, began cross-examination. Within less than a minute's time, and despite the district court's twice having ruled he could not do so, Gantley attempted to bolster his veracity by mentioning he had taken a polygraph examination. The trial transcript reveals the following exchange between Gantley and Taylor, beginning with Taylor's very first question on cross-examination:

Q. Mr. Gantley, you have given a different version of that first conversation on March 13th where you signed up with the credit bureau than was given by Steve and Deryl. You recognize that, don't you?

A. Absolutely.

Q. You were here during their testimony; correct?

A. Sure.

Q. And you heard them testify that you told them you were a paralegal, newly in town, had not set up an office yet, you were going to be doing collections for attorneys, and their entire explanation, you heard all that; right?

A. Yes, sir.

Q. And you're saying to this jury that you told them that you were doing an investigation, you were up-front with them, and that if anybody violated the Fair Credit Reporting Act, it was them?

A. Sir, you're asking me three questions at one time. Would you please give them to me one at a time?

Q. Is it your position that it was them who assisted you in what we now know to be a violation of the Fair Credit Reporting Act?

\* \* \* \* \* \*

A. The answer is they assisted me in nothing. If the Fair Credit Reporting Act was violated, they did it themselves. I was not part of that.

Q. That's correct. If you're telling the truth, they're the ones who violated the Act; right?

A. Yes, sir, and you know I'm telling the truth, because you saw the polygraph test I took in the past—

MR. TAYLOR: Your Honor—

THE WITNESS:—that was used—

THE COURT: Mr. Gantley, Mr. Gantley, sit down and be quiet. Members of the jury, I'm going to excuse you to the jury room.

Joint Appendix ("J.A.") at 122–24.

The parties have characterized the emotional component of Judge Forester's initial reaction as quite strong. After the jury left the courtroom, Judge Forester made the following statements:

THE COURT: Mr. Gantley, I'm of the opinion that this was a purposeful statement by you, knowing that you violated the Court's order with regard to the polygraph examination to unlawfully influence the jury here today. I don't like it.

THE WITNESS: Sir, that's not—

THE COURT: I'm holding you in contempt of court for this obvious, this obvious attempt you have made to influence this jury illegally. So I'm going to—will be filing charges against you on that. I'm going to declare a mistrial. This is over. This statement was made—just unbelievable. I've never had this happen before in nine years, but I think that this is the sort of thing that Mr. Gantley has done in the past and he con-

tinues to do in the future. So there is a mistrial. I'm going to ask Madame Clerk to do whatever is appropriate to charge Mr. Gantley with contempt of court, and I will recuse and will not be involved in that. So, Mr. Gantley, you may step down.

\*　　\*　　\*　　\*　　\*　　\*

J.A. at 124–25. Judge Forester then ordered Gantley to be released on bond pending retrial and asked counsel to approach the bench.

The immediately subsequent colloquy between Judge Forester and counsel was not preserved on the record. When the district court went back on the record, however, Judge Forester made the following statements:

> THE COURT: After reflecting on the contempt of court matter, the Court is of the opinion that Mr. Gantley probably, being the type individual that he is, probably did not know what he was doing and, as has been said, he's a combative-type personality, and so I am going to withdraw any reference to contempt of court with regard to Mr. Gantley, and the Court will recuse from this case and it will be under the general orders and it will be assigned to Judge Wilhoit for reassignment. All right. Anything else?

J.A. at 125. In response to this last question, Gantley's attorney replied "No, Your Honor." Judge Forester then called the jury back into the courtroom and explained as follows:

> THE COURT: Members of the jury, I apologize to you for wasting two days of your time. I don't know if you know what happened there, but Mr. Gantley, while testifying, indicated that he had taken a polygraph examination and that he had passed that examination. I

think he got that far. Well, I had previously ruled that there could be no reference to a polygraph examination because the polygraph has not reached the degree of reliability to where results of such an examination are accepted by courts as evidence. They're not accepted by courts as evidence anywhere that I know of, and I had made it clear that this was not going to be accepted. But he went ahead and mentioned the polygraph examination. Well, this should not have happened. So I have declared a mistrial, and we'll have to try again some other day with some other jury. So I do apologize to you for taking up two days of your time.

> So we'll excuse you now. Thank you very much.

J.A. at 126–27. After the jury left the courtroom, Judge Forester again asked counsel if there was "anything else," and counsel again said "no."

Gantley's case was reassigned to the Honorable Joseph M. Hood, who set a third trial date of August 21, 1997. Nine days before trial, however, Gantley filed a motion to dismiss the information, asserting that a third trial would violate the Fifth Amendment's prohibition against double jeopardy. Judge Hood held a hearing on this motion on August 18, 1997. During this hearing, counsel for the parties explained to Judge Hood what had happened during Judge Forester's "off-the-record" conference with counsel, which had occurred just after Gantley mentioned his voluntary polygraph examination. Specifically, the parties explained to Judge Hood, essentially without dispute, that: (1) Judge Forester was initially very angry with Gantley but he quickly "cooled off;" (2) Mr. Taylor, on behalf of the government, suggested to Judge Forester that there might be an alternative to declaring

a mistrial;[1] (2) Gantley's counsel then raised an "[additional] concern that the district court's admonition of Gantley in the presence of the jury may have been prejudicial," appellant's brief at 5; (3) Judge Forester concluded that, in fact, the jury's perception of Gantley's statement and his own reaction to it might seriously prejudice Gantley's right to a fair trial, so that Taylor's suggested alternative was unacceptable; and (4) Judge Forester also reconsidered his decision to hold Gantley in contempt of court, and decided to reverse that decision. J.A. at 128–49.

After Judge Hood heard all of this evidence during the hearing, he issued a written Order formally denying Gantley's motion to dismiss the information. In this Order, Judge Hood concluded that Judge Forester's declaration of a mistrial was a "manifest necessity" because of "the potential bias of the jury as a result of the defendant's statement regarding the polygraph." J.A. at 16. Gantley then moved to stay further proceedings pending an interlocutory appeal, and Judge Hood granted that motion.

## II. Analysis.

■ In *United States v. Cameron*, 953 F.2d 240, 243 (6th Cir.1992), this Court held that the denial of a motion to dismiss on double jeopardy grounds is immediately appealable. *See also Abney v. United States*, 431 U.S. 651, 655–56 & 659–60, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (holding that "a pretrial order denying a motion to dismiss an indictment on double jeopardy grounds is a final decision within the meaning of 28 U.S.C. § 1291"). Accordingly, we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We review *de novo* a district court's denial of a motion to dismiss on grounds of double jeopardy. *Cameron*, 953 F.2d at 243. However, "the decision of a trial court to declare a mistrial based on potential juror bias is entitled to special respect." *Harpster v. Ohio*, 128

F.3d 322, 330 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998); *see Arizona v. Washington*, 434 U.S. 497, 511, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) ("the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by [an] improper comment").

■ The Constitution directs that no person shall twice be put in jeopardy of life or limb for the same offense, whether by being twice punished or twice tried. U.S. Const. amend. V; *Price v. Georgia*, 398 U.S. 323, 326, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970). The Double Jeopardy Clause, however, does not act as an absolute bar to reprosecution in every case. When a mistrial has been declared, "reprosecution is generally permissible if the declaration came at the request or with the acquiescence of the defendant." *Cameron*, 953 F.2d at 243 (citing *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976)). Alternatively, "in the absence of such consent, reprosecution is not barred where a 'manifest necessity' exists to declare a mistrial in the defendant's initial prosecution." *Id.* (citing *United States v. Sanford*, 429 U.S. 14, 16, 97 S.Ct. 20, 50 L.Ed.2d 17 (1976) (per curiam)). Put more simply, "[o]nce jeopardy attaches, prosecution of a defendant before a jury other than the original jury, excluding any contemporaneously empaneled and sworn alternates, is barred unless (1) there is a 'manifest necessity' for a mistrial or (2) the defendant either requests or consents to a mistrial." *Watkins v. Kassulke*, 90 F.3d 138, 141 (6th Cir. 1996).

In this case, the government argues that the double jeopardy bar should not apply, both because Gantley consented to the declaration of a mistrial and because a

---

1. The record does not reveal precisely what Mr. Taylor's suggested alternative was; pre-

sumably, however, it involved the giving of a limiting or curative instruction.

mistrial was manifestly necessary. We find that both of these arguments are well-taken.

### A. Consent.

■ The parties agree that Gantley never *explicitly* consented to Judge Forester's decision to declare a mistrial. Immediately after Gantley testified that he had taken a polygraph examination, Judge Forester exclaimed, "I'm going to declare a mistrial." Rather than dismissing the jury immediately, however, Judge Forester discussed the matter further with counsel for both parties and considered whether there was a viable alternative to declaring a mistrial. After undertaking this consideration, Judge Forester remained of the belief that declaring a mistrial was necessary. The record does not show that Judge Forester or anyone else ever explicitly asked Gantley or his counsel whether they consented to a mistrial, but the record does reveal that neither Gantley nor his counsel ever objected. This is true even though: (1) there was an opportunity for Gantley's counsel to raise such an objection during the "off-the-record" colloquy between counsel and Judge Forester; and (2) Judge Forester twice gave Gantley's counsel an opportunity to raise any objection to the district court's proposed course of action.[2]

■ The government argues that, even though Gantley never explicitly consented to a mistrial, he impliedly consent to one. This Court has held that a defendant's consent to a declaration of mistrial "should be implied 'only where the circumstances positively indicate a defendant's willingness to acquiesce in the [mistrial] order.'" *Glover v. McMackin,* 950 F.2d 1236, 1240 (6th Cir.1991) (quoting *Jones v. Hogg,* 732 F.2d 53, 57 (6th Cir.1984)) (brackets in original); *see Malinovsky v. Court of Common Pleas of Lorain County,* 7 F.3d 1263, 1272 (6th Cir.1993), *cert. denied,* 510 U.S.

1194, 114 S.Ct. 1300, 127 L.Ed.2d 652 (1994) ("Sixth Circuit precedent is clear that consent is implied only if there is some positive indication from the record of the defendant's willingness to consent to declaration of a mistrial"). The question in this case, therefore, is whether Gantley's failure to object to a mistrial can be construed as a "positive indication" of his consent to a mistrial.

In *United States v. Ham,* 58 F.3d 78 (4th Cir.1995), *cert. denied,* 516 U.S. 986, 116 S.Ct. 513, 133 L.Ed.2d 422 (1995), the Fourth Circuit Court of Appeals observed that "a number of circuits have held that a defendant impliedly consents to a mistrial if the defendant had a duty to object to the mistrial but fails to do so." *Id.* at 83 (citing cases). The *Ham* court suggested, however, that this Circuit's requirement of a "positive indication" of consent circumscribes those circumstances where consent may be implied more narrowly than does the test employed in other circuits. *Id.*

■ In fact, this Court's test for whether a defendant has impliedly consented to a mistrial is not materially different from the test used by other Circuits. *See, e.g., United States v. Goldstein,* 479 F.2d 1061, 1067 (2nd Cir.1973), *cert. denied,* 414 U.S. 873, 94 S.Ct. 151, 38 L.Ed.2d 113 (1973) ("[c]onsent need not be express, but may be implied from the totality of circumstances attendant on a declaration of mistrial"); *Ham,* 58 F.3d at 83 n. 3 (noting that even though it believed "the Sixth Circuit does not follow the majority view, the First Circuit has concluded that the Sixth Circuit has actually not set a different standard") (citing *United States v. DiPietro,* 936 F.2d 6, 10–11 (1st Cir.1991)). Rather, this Circuit simply insists on an especially careful examination of the totality of circumstances, to ensure a defendant's consent is not implied when there is a substantial question of whether the de-

---

**2.** Judge Forester asked Gantley's counsel whether there was "anything else" two times—once immediately after going back

"on-the-record" after the colloquy with counsel and once after he excused the jury.

fendant did, in fact, consent. Because there are "drastic consequences attached to a finding of consent" to a mistrial, *Glover*, 950 F.2d at 1239, we have refused to infer consent merely because a defendant did not object to the declaration of a mistrial. *Id.* at 1240 (noting that the totality of the circumstances suggested "an objection [by the defendant] would have been difficult and probably futile"). Rather, a defendant's failure to object to a mistrial implies consent thereto only if the sum of the surrounding circumstances positively indicates this silence was tantamount to consent.[3]

Because simple silence can be a positive indication of consent to a mistrial in some circumstances, Gantley cannot avoid implication of consent merely by noting he did not expressly consent; his absence of explicit assent must be examined in light of all the circumstances surrounding it. In this case, Gantley's failure to object to a mistrial occurred only after Judge Forester: (1) heard Gantley's counsel's suggestion that Judge Forester's own reaction caused Gantley incurable prejudice; (2) considered the possibility of an alternative course of action; (3) decided there was no viable alternative to a declaration of a mistrial; and (4) essentially invited an objection by asking counsel if there was "anything else" to address.

In sum, we conclude that Sixth Circuit precedent does permit us to find Gantley impliedly consented to the declaration of a mistrial, even if Gantley's "positive indication" of consent was in the form of silence. Further, we believe that the totality of the circumstances in this case justifies the conclusion that Gantley did, in fact, consent to Judge Forester's declaration of a mistrial.[4]

## B. Manifest Necessity.

The phrase "manifest necessity" is a term of art, which "has come to mean not absolute necessity, but rather a 'high degree' of necessity." *Glover*, 950 F.2d at 1240. The power of a judge to declare a mistrial based on manifest necessity must "be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *United States v. Perez*, 22 U.S. (9 Wheat) 579, 580, 6 L.Ed. 165 (1824). Because it is impossible to catalog every circumstance where it has become manifestly necessary to declare a mistrial, the manifest necessity test has "never been applied in a mechanical fashion, but is viewed as a flexible standard." *Cameron*, 953 F.2d at 244 (citing *Illinois v. Somerville*, 410 U.S. 458, 462, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973)). "Determining whether a high degree of necessity was presented calls for an analysis of each case upon its particular facts." *Id.*

A trial court "is not constitutionally required to make an explicit finding of 'manifest necessity,' nor to establish on the record the full extent of its carefully considered basis for the mistrial." *Glover*, 950 F.2d at 1241 (citing *Washington*, 434 U.S. at 516–17, 98 S.Ct. 824). One of the factors a reviewing court will consider in determining whether the trial court abused its discretion by declaring a mistrial, however, is whether the trial court showed sufficient caution before its declaration. Thus, in *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), the Supreme Court upheld a trial court's declaration of mistrial only after noting that "the trial judge did not act precipitately.... On the contrary, evincing a

---

3. Indeed, consent can only be explicit or implicit; this Circuit's recognition that a defendant may impliedly consent to a mistrial *requires* us to acknowledge that silence may be a positive indication of consent, in the right circumstances.

4. Actually, Gantley's counsel's affirmative suggestion of possible prejudice stemming from Judge Forester's reaction, followed by counsel's explicit negative response when asked if there was anything else the Court needed to address, brings into question Gantley's assertion that he was silent. These circumstances lend further support to our conclusion that a positive indication of Gantley's consent to a mistrial is evident in the record.

concern for the possible double jeopardy consequences of an erroneous ruling, he gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial." *Id.* at 515–16, 98 S.Ct. 824.[5]

It is clear that a great potential for jury bias existed at the time Judge Forester declared a mistrial. This is true for two reasons. The first source of jury bias was Gantley's statement, made in direct violation of a court order, that he had taken a polygraph test. Gantley's intent in making this statement obviously was to bolster his own testimony, to the prejudice of the government.[6] Evidence of polygraph examination results is generally inadmissible. *United States v. Blakeney,* 942 F.2d 1001, 1014 (6th Cir.1991), *cert. denied,* 502 U.S. 1035, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992). The reason for this is "the general skepticism that pervades the scientific community concerning the reliability of polygraph examination." *Wolfel v. Holbrook,* 823 F.2d 970, 974 (6th Cir. 1987), *cert. denied,* 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988). Allowing a jury to hear evidence of the results of a lie detector test is "highly prejudicial" in a case like Gantley's, because "the entire case hinge[s] on whether the jury believe[s] [Gantley's] version of the facts." *Id.* at 973.[7] Thus, the jury could not help but suffer some unfair bias against the government by virtue of Gantley's statement regarding his having taken a polygraph examination. Indeed, at least two other federal courts have affirmed declarations of mistrial after a witness testified about polygraph examination results, concluding that the strong possibility of jury bias undermined confidence in a fair outcome. *See Ferby v. Blankenship,* 501 F.Supp. 89, 92 (E.D.Va.1980) (on habeas review, affirming the state trial court's conclusion that, after a witness testified the defendant was willing to take a lie detector test, a mistrial was appropriate because "[curative] instructions could not preserve the integrity of the verdict"); *Pettigrew v. Hardy,* 403 F.Supp. 869, 870 (D.Ariz.1975) (on habeas review, affirming the state trial court's conclusion that a mistrial was necessary after the defendant testified he passed a lie detector test).

The second source of jury bias was Judge Forester's strong reaction after

---

**5.** Another important factor a trial court should consider when calculating the degree of necessity for declaring a mistrial is "who sought the mistrial." *Malinovsky,* 7 F.3d at 1269. If "a declaration of mistrial [is] granted at the behest of *the prosecutor or on the court's own motion,*" then the court must balance "the right of [the] defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him … against the public interest in insuring that justice is meted out to offenders." *United States v. Scott,* 437 U.S. 82, 92, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978) (quoting *Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963)) (emphasis added). But if the *"defendant* successfully seeks to avoid his trial prior to its conclusion by a motion for mistrial, the Double Jeopardy Clause is not offended by a second prosecution." *Id.* at 93, 98 S.Ct. 2187 (emphasis added). Here, Gantley did not move for a mistrial, but he did create the circumstances making it necessary. This factor adds at least some weight to our conclusion that the declaration of a mistrial in this case is fair. To hold otherwise would allow a defendant to avoid prosecution by creating error purposefully while refusing to move for a mistrial.

**6.** Although Gantley contends he actually never stated the results of this examination, "it would have to be a pretty unsophisticated jury not to figure out that he had passed the test or it wouldn't have been mentioned." J.A. at 131 (Hood, J., during Aug. 18, 1997 hearing). This is especially true when the statement is examined in its entirety: Gantley premised his reference to the polygraph examination with the clause, "… and you know I'm telling the truth, because…." J.A. at 123.

**7.** Gantley does not challenge Judge Forester's ruling excluding evidence of the polygraph examination. It is clear, however, that Judge Forester's ruling was correct, given that "there was no agreement or stipulation between the parties that the results of the examination, whatever they might reflect, would be admissible in subsequent litigation and hence, [Gantley] had no adverse interest at stake to cloak his willingness with credibility." *Wolfel,* 823 F.2d at 974.

Gantley mentioned the polygraph examination. Gantley candidly admits this point: "a mistrial may have become necessary due to the unfavorable light [Gantley] was placed in before the jury by the admonishment directed at him by the district court." Appellant's brief at 15. Gantley's concession is well-founded because, as Judge Forester himself perceived, the jury's observation of Judge Forester's displeasure toward Gantley could have seriously and unfairly prejudiced the jury against Gantley. Not only is there a "fundamental need for judicial neutrality" in every case, but the jury must also *perceive* the judge as neutral—" 'justice must satisfy the appearance of justice.' " *Anderson v. Sheppard,* 856 F.2d 741, 746, 747 (6th Cir.1988) (quoting *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954)). We have no reason to believe (and the parties do not argue) that Judge Forester was anything but neutral in fact. But the parties and Judge Forester rightly believed that the jury might have come to think Judge Forester was inclined against Gantley. The jury's observation of Judge Forester's understandable, if short-lived, anger against Gantley is likely to have caused some level of unfair jury bias.

Gantley focuses only on Judge Forester's immediate reaction and argues that: (1) Judge Forester declared a mistrial based only on the possible jury bias stemming from Gantley's comment, and not any possible jury bias stemming from Judge Forester's reaction; and (2) Judge Forester declared a mistrial without first considering any alternatives. We disagree with both these assertions. Although Judge Forester immediately expressed his intention to declare a mistrial, it is undisputed that he reconsidered this decision after discussing alternatives. Further, Judge Forester joined in the concern expressed by Gantley's counsel about possible juror bias caused by his reaction to Gantley's testimony. In the end, Judge Forester obviously concluded that a mistrial was necessary because the sum of the potential unfair jury bias was too great—that is,

that the "totality of the circumstances" made a mistrial manifestly necessary.

We are required to "accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by [an] improper comment" during trial. *Arizona v. Washington,* 434 U.S. at 511, 98 S.Ct. 824. In this case, it would not have been unreasonable for Judge Forester to conclude that the potential jury bias stemming from Gantley's comment, alone, was excessive and required a mistrial; *a fortiori,* it was not unreasonable for Judge Forester to conclude that the total potential jury bias stemming from both Gantley's comment and Judge Forester's reaction to it made a mistrial manifestly necessary.

▮ A defendant's "right to have his case resolved by a particular tribunal will be subordinate to the larger interest of the public in 'fair trials designed to end in just judgments.' " *Cameron,* 953 F.2d at 243 (quoting *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949)). In this case, Judge Forester reasonably concluded that potential jury bias created too significant a risk that any final judgment would not be impartial. Because we believe there existed a high degree of necessity for declaring a mistrial and that Judge Forester reached this conclusion only after considering whether there were other, less severe alternatives, we conclude that Gantley's interlocutory appeal is not well-taken. We affirm Judge Hood's denial of Gantley's motion to dismiss the criminal information. This case is remanded for trial.

**IT IS SO ORDERED.**

NATHANIEL R. JONES, Circuit Judge, concurring.

I agree in full with the panel's well-founded conclusions that manifest necessity for a mistrial existed in this case and that Gantley impliedly consented to the mistrial. I write separately only to emphasize that, in my judgment, the court's

decision today is not an abandonment of our usual preference that a district court issue curative instructions when a witness makes an impermissible reference to a polygraph examination before a jury. The district court's failure to do so, under the facts of this case, was not reversible error.

This court has refused to adopt a *per se* rule that a manifest necessity for a mistrial is present simply because a witness utters the words "polygraph evidence." *United States v. Odom,* 13 F.3d 949, 957 (6th Cir.1994); *United States v. Walton,* 908 F.2d 1289, 1293 (6th Cir.1990); *United States v. Betancourt,* 838 F.2d 168, 175 (6th Cir.1988). Instead, we have repeatedly upheld the use of curative or cautionary instructions to juries explaining that impermissible references to unreliable polygraph examinations are improper and to be disregarded. *See United States v. Epley,* 52 F.3d 571, 578 & n. 8 (6th Cir.1995); *Odom,* 13 F.3d at 957; *Walton,* 908 F.2d at 1294. Granted, we have also found circumstances where not even a curative instruction could "unring [the] bell" of a prejudicial reference to a polygraph examination. *See United States v. Murray,* 784 F.2d 188, 189 (6th Cir.1986) (curative instruction not enough to remedy experienced FBI agent's deliberate statement that he had asked defendant to take a polygraph test). However, it cannot be doubted that our precedents strongly favor a curative admonition to the jury when a witness makes an impermissible reference to a polygraph examination.

Based upon the record in this case as artfully reconstructed in the panel opinion, I am of the view that the issuance of curative instructions in this case would have been an exercise in futility. Unlike the above-cited cases, the district judge himself contributed to the tainting of the proceedings. In addition to the inherent prejudice that Gantley's improper polygraph reference injected into the trial, I believe it very likely that the district court's subsequent visible outburst seriously impaired Gantley's standing in the eyes of the jury. Thus, based upon the totality of the circumstances as articulated by the panel opinion, I agree that the district court's declaring a mistrial was justified by manifest necessity in this case.