NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0525n.06

No. 18-6183

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Oct 16, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| JOHNNY L. SHELTON, | ) | EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:     MERRITT, DAUGHTREY, and GRIFFIN, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.  After first declaring a mistrial based on a finding of manifest necessity, the district court ordered that defendant Johnny L. Shelton be retried on the charge of conspiracy to distribute carfentanil resulting in the death of another individual.  In that retrial, the jury found Shelton guilty of the single charge against him.  Given Shelton's prior drug convictions, the district court then imposed a mandatory sentence of life in prison.  On appeal, Shelton now challenges the propriety of the ordered retrial, the sufficiency of the evidence supporting his conviction, various aspects of the indictment returned against him, and portions of the jury instructions given by the district court both prior to the beginning of the jury's deliberation and after the jury sought clarification of one instruction.  For the reasons discussed below, we find no error that would necessitate yet another retrial or dismissal of the charges against Shelton.  We thus affirm the judgment of the district court in its entirety.

**FACTUAL AND PROCEDURAL BACKGROUND**

At all times relevant to this appeal, Johnny Shelton was housed either in one of the barracks at the Boone County (Kentucky) Work Camp or at the Boone County Jail adjacent to the work camp. Other inmates noticed that Shelton routinely possessed large amounts of cash—anywhere from a few hundred dollars to $1,500. In fact, one inmate testified that Shelton once claimed that "he could make a thousand to $2,000 a day while in jail."

Despite the fact that the inmates at the work camp were incarcerated for various criminal offenses, contraband materials such as drugs, alcohol, tobacco products, cigarette lighters, pornography, candy, cell phones, syringes, and bleach routinely were introduced into the facility. Some of those items were transferred to inmates during visitation periods with family and friends. Because some of the inmates were allowed to leave the camp to work at regular jobs, other items of contraband were brought into the facility by those individuals who were not subjected to thorough pat-down searches upon their return to the work camp. Still other items were left in dumpsters or in the garage at the facility to be recovered by inmates on work details who regularly had access to those locations.

On October 14, 2016, Shelton spoke with fellow inmates Chad Prodoehl and Gordon Wanser about obtaining drugs from Shelton's cousin, Terrill (Cuzo) Hill, and having those controlled substances smuggled into the work camp. Because Prodoehl was authorized to leave the camp in his own vehicle to work at an outside job, Shelton gave Prodoehl a paper with Hill's cell phone number on it and discussed arrangements to have Prodoehl meet with Hill to receive cocaine and heroin.

The following day, October 15, 2016, Prodoehl returned from his job with a package wrapped in plastic and blue tape and gave the package to Shelton in exchange for $40. Upon

hearing that Prodoehl had returned with the promised drugs, Wanser and Shaun Houglin, another inmate, sought out Shelton, and Wanser paid Shelton $160 for two grams of crack cocaine and a gram of what Wanser believed was China white heroin. Because Shelton told Wanser that the product was "good" and needed to be cut with some other substance to minimize its effects, Wanser asked Houglin to test the substance first.

Even though Houglin had taken a quarter dose of Suboxone—a substance that blocks the effect of opiates—earlier in the day, he stated that even the small amount of the supposed heroin that he injected was "[v]ery powerful" and "[v]ery euphori[c]." In fact, the effects were so profound that Houglin's next memory after injecting the drug was sitting, fully dressed, in the shower several hours later. Wanser too injected a small sample of the drug purchased from Shelton. And he too attested to the drug's strength, stating that upon injecting himself, he fell against the bathroom wall and began vomiting.

Later, after dinner that evening, Wanser shared some of the drug with inmate Timothy Marcum, who snorted "a line off of [Wanser's cell] table." The drug "messed [Marcum] up pretty good," so that "[h]e was kind of going in and out, nodding in and out." Because of Marcum's condition and the fact that Marcum "was struggling a little bit" to breathe, Wanser placed Marcum in a bottom bunk so that he would not fall from the bed in his stupor.

When Marcum did not respond to the call for breakfast the following morning, jail officials checked on Marcum in his cell and found him gray, cold, without a pulse, and with a bile-like or coffee-ground-like substance caked around and oozing from his mouth. Efforts by the jail personnel and emergency responders to resuscitate Marcum proved futile, and a firefighter

paramedic declared Marcum dead. A subsequent autopsy confirmed that Marcum died from acute carfentanil intoxication.[1]

The police investigation into Marcum's death soon focused upon Wanser, Prodoehl, Hill, and Shelton, and the four men were indicted for conspiring "together and with others to knowingly and intentionally distribute and possess with intent to distribute carfentanil, a Schedule II controlled substance." The indictment continued, "As to TERRILL J. HILL, aka CUZO, JOHNNY L. SHELTON, and CHAD H. PRODOEHL, these violations resulted in death."

Shelton was tried separately from the other alleged co-conspirators, with the trial beginning on January 22, 2018. At the end of the first day of trial, however, the district court noted that it had observed Shelton's frustration with the failure of his attorney to pose certain relevant questions to the prosecution witnesses. Shelton concurred, stating that his counsel, Dennis Alerding was "missing key factors in his cross-examination," that Shelton was "not getting the best representation," and that "[Shelton had] to tell [his] attorney certain things, how to defend [him]. Ultimately, Shelton made an oral motion to remove Alerding as his attorney, expressing his discomfort with Alerding's representation. Specifically, Shelton complained that Alerding spoke with him only three times before trial, that Alerding failed to procure certain experts, that Alerding did not have Shelton's best interests at heart, and that Alerding failed to communicate appropriately with him. Even so, at the conclusion of the discussion, the district court denied Shelton's request for a new lawyer.

The following morning, however, the district court announced that it had reconsidered Shelton's request and had decided to grant the motion for new counsel. According to the district court, "it has been apparent from the very beginning of the trial that [Shelton] and Mr. Alerding

---

[1] Scientific testimony established that carfentanil is a synthetic opioid that is used in veterinary medicine as a tranquilizer for large animals like elephants, rhinoceroses, yaks, and bears. It has no intended use in humans.

have been at odds with each other at seemingly every turn; arguing with each other, often in front of the jury." "There is a wall . . . between the two of you that I've seen throughout the trial." In light of that public friction, in conjunction with Alerding's failure to follow up on requests made by Shelton and the attorney's failure to obtain prior court rulings in a timely manner, the district court indicated that it felt it had no choice but to afford Shelton new counsel. Due to the need to afford Shelton's new lawyer an opportunity to prepare a defense, the district court also stated that it was "going to have to declare a mistrial." "It's the appropriate thing to do."

Shelton's retrial began approximately five months later. At the conclusion of those proceedings, the newly empaneled jury unanimously found Shelton guilty of "the charge in Count One of the Indictment." The district court then imposed the mandatory sentence of life in prison required by the provisions of 21 U.S.C. §§ 846 and 841(b)(1)(C).

## DISCUSSION

**Declaration of a Mistrial**

Despite the fact that it was Shelton himself who moved for appointment of new counsel, he now asserts that the district court's decision to accede to that motion and then grant a mistrial after the first full day of testimony in January 2018 improperly subjected him to double jeopardy. Because Shelton did not raise this issue before the district court, we review it for plain error only. *See, e.g., United States v. Armstrong*, 920 F.3d 395, 400 (6th Cir. 2019). Thus, to prevail on this issue, Shelton must establish that there was (1) error (2) that was "plain," (3) that affected substantial rights of the defendant, and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732–36 (1993).

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or

limb." U.S. Const. amend. V. "The Double Jeopardy Clause, however, does not act as an absolute bar to reprosecution in every case." *United States v. Gantley*, 172 F.3d 422, 427 (6th Cir. 1999). "Once jeopardy attaches, prosecution of a defendant before a jury other than the original jury . . . is barred unless (1) there is a 'manifest necessity' for a mistrial or (2) the defendant either requests or consents to a mistrial." *Watkins v. Kassulke*, 90 F.3d 138, 141 (6th Cir. 1996); *see also United States v. Dinitz*, 424 U.S. 600, 606–07 (1976).

"Broad discretion [is] reserved to the trial judge" in determining whether there is indeed manifest necessity to order a mistrial. *Illinois v. Somerville*, 410 U.S. 458, 462 (1973). When reviewing the decision by a district court to order a mistrial, however, we do consider "whether the trial court showed sufficient caution before its declaration." *Gantley*, 172 F.3d at 429. In other words, we must ensure that "the trial judge did not act precipitately[, but rather] evince[d] a concern for the possible double jeopardy consequences of an erroneous ruling, [giving] both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial." *Arizona v. Washington*, 434 U.S. 497, 515–16 (1978). Furthermore, as we explained in *Gantley*:

> Another important factor a trial court should consider when calculating the degree of necessity for declaring a mistrial is "who sought the mistrial." *Malinovsky [v. Court of Common Pleas of Lorain Cty.*, 7 F.3d 1263, 1269 (6th Cir. 1993)]. If "a declaration of mistrial [is] granted at the behest of *the prosecutor or on the court's own motion*," then the court must balance "the right of [the] defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him . . . against the public interest in insuring that justice is meted out to offenders." *United States v. Scott*, 437 U.S. 82, 92, 98 S. Ct. 2187, 57 L. Ed.2d 65 (1978) (quoting *Downum v. United States*, 372 U.S. 734, 736, 83 S. Ct. 1033, 10 L. Ed.2d 100 (1963)) (emphasis added).

*Gantley*, 172 F.3d at 430 n.5.

We find nothing in the record before us that would lead us to conclude that the district court abused its "broad discretion" in declaring a mistrial on its own motion. The district court clearly

gave much thought to its decision. Although first denying Shelton's motion for a new attorney, the district court reconsidered that ruling before the start of court proceedings the next morning. In doing so, the district court expressed consternation over the obvious distrust Shelton had for Alerding, a distrust that manifested itself as bickering between client and attorney in front of the jury. Moreover, the district court noted that Alerding failed to access court rulings in a timely manner and that the attorney-client relationship had broken down completely. As the district court stated, "I just feel like there needs to be some level of assurance—some assurance or trust between the lawyer and the client that I don't sense is there."

On appeal, Shelton now claims that he was willing to proceed to trial with Alerding as his attorney. It is true that after the district court reconsidered its original denial of the request for new counsel, it asked Shelton directly whether he wanted to keep Alerding as his attorney. In response, Shelton stated, "I mean, at the end of the day, yes, we can proceed." When viewed in the context of the entire exchange among the interested parties, however, it is clear that Shelton's decision was borne more of resignation than acquiescence. Indeed, his statement to the court was colored by his recognition that any delay would result in him spending additional time in solitary confinement, rather than in the general jail population, and that he would be found guilty regardless of the legal representation offered him because of the prosecution's alleged knowing use of perjured testimony in its case-in-chief.

Moreover, Shelton continued to express the same discomfort with Alerding's representation that so bothered the district court. When asked by the district court to state his position on discharging Alerding, Shelton responded, "But I feel like right now, in this matter, that he's not putting his best foot forward into representing me." In such circumstances, we cannot find that the district court abused its discretion in granting a mistrial in order to prevent Shelton

from being prejudiced not only by possible ineffective assistance of trial counsel, but also by the jury's observation of Shelton's distrust of and disagreements with his own attorney.

It bears further mention that it was Shelton himself who first requested that the district court grant his motion to appoint a new attorney to represent him. Shelton must have realized that, in making such a motion, a successful resolution of his request would necessitate a mistrial due to the resulting lengthy pause in the proceedings.

**Sufficiency of Evidence of Guilt**

Shelton also alleges that he should not have been found guilty of the charged offense because no evidence was adduced to show that *he* provided Marcum the carfentanil-laced heroin that resulted in death. He further claims that his guilt cannot be based upon acts taken by Wanser in giving Marcum the controlled substance because Wanser cannot be considered his co-conspirator.

When challenging the legal sufficiency of the evidence to support a guilty verdict, a defendant bears a "heavy burden." *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) (citation omitted). In fact, when reviewing such a challenge, we ask simply "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The jury found Shelton guilty of "the charge in Count One of the Indictment," that is, conspiring to "distribute and possess with intent to distribute carfentanil, a Schedule II controlled substance, violations of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846." We have held that to establish a violation of 21 U.S.C. § 846, the government need prove only "the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and

participated in the conspiracy." *United States v. Volkman*, 797 F.3d 377, 390 (6th Cir. 2015) (citation omitted).

Nevertheless, Shelton contends that, although he might be guilty of a conspiracy to distribute controlled substances, he cannot be subjected to an enhanced penalty as a result of Gordon Wanser's delivery of a controlled substance to Timothy Marcum that led to Marcum's death. In support of that position, Shelton cites *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946), in which "the Supreme Court held that a co-conspirator may be vicariously liable for the substantive offense committed by a co-conspirator if the act is done 'in furtherance of the conspiracy' and is 'reasonably foreseen as a necessary or natural consequence of the unlawful agreement.'" *United States v. Swiney*, 203 F.3d 397, 401 (6th Cir. 2000). Because the district court did not charge the jury that the death from injection of the controlled substance must have been foreseeable, Shelton submits that principles of co-conspirator liability cannot be relied upon in this case.

As we noted in *Volkman*, however, "[i]n order to establish that a death resulted from [d]efendant's conduct, the government need not prove that the death was foreseeable to the defendant." *Volkman*, 797 F.3d. at 392. Instead, what is required is that the government establish that Marcum's death resulted from the use of carfentanil that Shelton distributed.

Recognizing the roadblock that *Volkman* places in the path of his sufficiency-of-the-evidence challenge, Shelton argues that Wanser was simply a buyer of Shelton's drugs and not a co-conspirator at all. This argument too is unavailing. Shelton's counsel conceded before the district court that "the conspiracy [the government has] proven, without a doubt, was that there was an agreement between [Shelton], Gordon Wanser, and Chad Prodoehl to bring into the camp cocaine, heroin, and weed." He maintains, however, that the admitted conspiracy ended with the

transfer of drugs from Shelton to Wanser, and Shelton thus was absolved of all responsibility for independent actions taken by Wanser after that time. The evidence before the jury supports a different conclusion, however.

Trial testimony showed that it was Wanser who discussed with Shelton and Prodoehl a plan to obtain drugs from Hill. It was Wanser, with Shelton, who then sought out Shaun Houglin to test the drugs. It was Wanser who was heard discussing with Shelton the need to "cut" the drug. And it was Wanser who was told by Shelton "a million times to cut [the drug] specifically with coffee creamer."

In light of that testimony, we cannot conclude that no rational trier of fact could have found that Wanser was indeed a co-conspirator and that the government established the essential elements of the charged crime beyond a reasonable doubt. We thus find no merit to Shelton's sufficiency-of-the-evidence claim.

**Alleged Inconsistency Between Indictment and Relevant Jury Instructions**

Shelton also submits that the verdict returned by the jury does not justify the sentence imposed upon him. Specifically, he argues that, despite the fact that the indictment in this case alleged that the charged conspiracy involved distribution of carfentanil, the jury instructions offered by the district court referred to a conspiracy to distribute only "a controlled substance." Consequently, according to Shelton, conviction for conspiracy to distribute a controlled substance listed in a schedule well below that of Schedule II could carry a prison sentence as low as four years, rather than the mandatory life sentence. Furthermore, Shelton contends that the jury's confusion over the difference between the charge in the indictment and the charge referred to in the jury instructions was shown by the jury's submission of the following question to the district

court in the midst of its deliberations: "In terms of the conspiracy, does distribution refer to carfentanil specifically or any controlled substance?"

Shelton cannot establish error in this regard, however. First, despite Shelton's claims to the contrary, the jury found him guilty of "the charge in Count One of the Indictment," a charge relating specifically to a conspiracy to distribute carfentanil, not just "a controlled substance." Second, we have held consistently held that "drug type and quantity are irrelevant to the mens rea element of § 841(a), which requires nothing more specific than an intent to distribute a controlled substance." *United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003) (citing *United States v. Garcia*, 252 F.3d 838, 844 (6th Cir. 2001)). "Likewise, intent is irrelevant to the penalty provisions of § 841(b), which require only that the specified drug types and quantities be 'involved' in an offense." *United States v. Gunter*, 551 F.3d 472, 485 (6th Cir. 2009) (citing *Garcia*).

As in *United States v. Dado*, 759 F.3d 550, 570 (6th Cir. 2014), "[d]efendant's argument confuses two distinct concepts—quantum of proof and *mens rea*." Thus, although the jury in this case was required to find, beyond a reasonable doubt, that the distribution of *carfentanil* caused Marcum's death, to hold Shelton guilty of the offense, the jury was required to conclude only that the defendant agreed to distribute a *controlled substance*. There is, therefore, no merit to this challenge by Shelton to his conviction and sentence.

**Alleged Internal Inconsistency in the Indictment**

In another appellate issue, Shelton points to alleged inconsistencies in the indictment returned by the grand jury, inconsistencies that he alleges should result in a dismissal of the charges against him. Allegations of defects in an indictment must be raised by pretrial motion. Fed. R. Crim. P. 12(b)(3)(B). Because Shelton failed to do so in this matter, we review his claims for plain error only. *United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015).

The first of Shelton's challenges to the indictment raised in this allegation of error contends that the "death results" enhancement should have been stricken from the charge because the crime at issue in the sole count of the indictment was an *agreement* to distribute carfentanil. According to Shelton, that crime was complete upon the consummation of the agreement itself. Because Marcum's death did not result from the mere agreement among the co-conspirators, the "death results" enhancement should not have been included in the indictment.

It is true that a § 846 conspiracy is considered complete upon the agreement of the parties. *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999). The indictment in this case, however, did not allege that the *agreement* to distribute controlled substances caused Marcum's death. Rather, the indictment clearly alleged that it was the *distribution* of carfentanil—the stated objective of the agreement—that resulted in the death. Thus, Shelton was subject to the "death results" enhancement of 21 U.S.C. § 841(b) not because he entered into an agreement with other individuals to distribute carfentanil, but because Marcum's death resulted from use of the carfentanil that *Shelton* distributed in furtherance of the conspiracy.

Shelton next claims that the charging document did not give him fair notice of the acts against which he had to defend because the "death results" enhancement fails "to allege a reasonably foreseeable overt act of distribution resulting in death." However, a conspiracy charged under § 846 does not require proof that the defendant committed any overt act in furtherance of the conspiracy. *Layne*, 192 F.3d at 567. In any event, it was exactly the act of distribution of the carfentanil that was alleged in the indictment that justified charging Shelton with the "death results" enhancement of § 841(b).

Finally, Shelton insists that the indictment is internally inconsistent because the one person who actually distributed the carfentanil-laced heroin to Marcum—Gordon Wanser—was not

included in the indictment's "death results" allegation. But the grand jury's decision whether to charge Wanser with a "death results" enhancement has no bearing whatsoever on the question of *Shelton's* guilt or innocence. Indeed, it has long been accepted that the grand jury and its charging decisions are "independent[ ] of either prosecuting attorney or judge." *Stirone v. United States*, 361 U.S. 212, 218 (1960). Furthermore, it is Shelton's own act of distributing carfentanil, not Wanser's conduct, that led to Shelton's liability for the "death results" enhancement. The district court thus did not commit plain error in refusing, on its own motion, to quash the indictment in this matter.

**Jury Instruction on Foreseeability of Death Resulting from Distribution of Carfentanil**

In his final appellate challenge, Shelton takes issue with the district court's decision to offer a jury instruction that stated that the government was not required to establish that Shelton "knew, or should have known, that death would result from the distribution or ingestion of the substance [that he distributed]." Shelton did not object to this jury charge at trial; therefore, our review of the issue is for plain error only.

Sixth Circuit precedent, as well as accepted Pattern Criminal Jury Instructions, make clear that "[i]n order to establish that a death resulted from [d]efendant's conduct, the government need not prove that the death was foreseeable to the defendant." *Volkman*, 797 F.3d at 392; Sixth Circuit Pattern Criminal Jury Instruction 14.02B(2)(C). The district court thus did not commit plain error in instructing the jury in accordance with established circuit law and practice.

**CONCLUSION**

None of the issues advanced by Shelton on appeal requires a finding that Shelton is entitled to the relief he seeks. We thus AFFIRM the judgment of the district court.