**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0461n.06

**Case No. 15-1745**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Aug 11, 2016 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| CLARENCE WILLIAMSON, JR., | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | O P I N I O N |

BEFORE:    COLE, Chief Judge; BATCHELDER and COOK, Circuit Judges.

COLE, Chief Judge.  For over a decade, Clarence Williamson headed a large cocaine and marijuana distribution organization in the Detroit, Michigan area.  A jury convicted him of three counts: conspiracy to possess with intent to distribute and to distribute cocaine and marijuana, conspiracy to launder money connected to drug trafficking, and conspiracy to possess a firearm in furtherance of drug trafficking.  He challenges those convictions on several grounds: first, that he was subjected to double jeopardy in violation of the Fifth Amendment; second, that there was insufficient evidence to convict him; third, that a police officer impermissibly offered lay opinion testimony by interpreting recorded phone conversations for the jury; fourth, that the prosecutor impermissibly vouched for the credibility of a witness.  Finding no reversible error, we affirm.

## I. BACKGROUND

In 2000, Williamson and his friend, Anthony Edwards, began buying and selling cocaine in the Detroit area—up to a kilogram a month. Dissatisfied with the quality and price of cocaine they were receiving from the Detroit suppliers, the two agreed that they needed a new source. Sometime around 2003, Williamson found a new supplier in California who went by the name of "Sweet."

Over the next several years, Williamson arranged to ship hundreds of kilograms of cocaine from California to Detroit. The plan was simple: a few times a month, some of Williamson's associates would drive a car loaded with cash to California, exchange the cash for several kilograms of cocaine, and then drive the car (now loaded with drugs) back to the Detroit area. Once back in Detroit, Williamson delivered the cocaine to lower-level dealers who sold it to users and remitted the proceeds back to him. Then, the process would start over: the cash from those sales would be transported by car to California and traded for more cocaine.

Sometimes, Williamson would accompany the cash and drugs on these drives to California and back. Other times, he flew to California and met the drivers there. If a problem with the exchange occurred, Williamson intervened to address it. For example, when Kendrah Smartt, one of Williamson's frequent couriers, was arrested in Nebraska on her way back from California with four kilograms of cocaine hidden in her car, Williamson gave her money for bail.

After several years of dealing cocaine, sometime around 2008 or 2009, Williamson also began dealing marijuana. He organized a similar transportation scheme. Once or twice a month, Williamson or his associates would drive a car loaded with cash to Arizona to meet with his marijuana supplier, Daryl Sewell. They would trade the cash for marijuana—typically between

80 and 100 pounds per trip—and then drive back to Detroit. Again, the cash from sales to users would be used to buy more marijuana.

At least twice, police stumbled upon Williamson's operation but did not pursue charges against him. In January 2005, on the outbound leg of one trip, Williamson and several associates were stopped in Oklahoma for erratic driving. The Oklahoma state troopers' subsequent search of the vehicle uncovered $1.5 million in cash and two loaded handguns hidden in secret compartments. Williamson and the other occupants disclaimed ownership of the money and guns, and were released. In October 2008, police in California caught Williamson in a "reverse sting" operation where an informant had offered to sell eight kilograms of fictitious cocaine. When the police arrived at the apartment where the deal was to have taken place, they found Williamson and several associates standing at the door (appearing to have just left the apartment), and a bag containing $150,000 in cash inside. Once again, Williamson was released.

Despite these setbacks, Williamson continued to prosper—at one point, he bragged to his girlfriend that he was a millionaire. He began operating out of a warehouse on Glendale Street in Detroit, nicknamed "The Factory." Detroit police became aware of this facility around 2010, and set up a "pole camera" so they could keep track of the operation in real time.

The camera led them to direct evidence of drug trafficking. In April 2010, the police observed a pick-up truck arrive at The Factory, and Williamson's son, Shaun Askew, load two garbage bags into its bed. The driver, Jaami Townsend, abandoned the truck in a parking lot when he noticed police following him. Williamson and Edwards picked up Townsend, and later in the day, Townsend's brother collected the abandoned truck. Police followed and eventually stopped and searched the truck, finding the bags to contain about 45 pounds of marijuana.

About five months later, the officers observed similar behavior at The Factory, with Askew loading garbage bags into a van driven by Terrell Clark. Clark and Askew then drove away from The Factory. A subsequent stop and search of the van revealed that the bags once again contained marijuana.

The police also tapped cell phones owned by Edwards, Williamson's original partner. In January 2011, the police learned through wiretaps that Williamson had agreed to sell multiple kilograms of cocaine to a buyer named Carl Jones. The police followed Williamson, Edwards, and Jones around town the day of the deal, as Williamson gave the cocaine to Edwards, Edwards gave it to Jones, Jones sold it to another man named Isaac Sheppard, and then Jones deposited the money from the sale at Williamson's sister's house. Police tailed Sheppard as he drove away from the sale. When they tried to stop him, he led them on a chase, during which he threw the cocaine out of his car window. The police recovered that cocaine, and eventually arrested Sheppard.

In September 2011, a federal grand jury indicted Williamson and seventeen other individuals on charges related to operating a drug trafficking ring. Williamson retained an attorney to defend him. Over two years later, less than a week before his trial was to begin, Williamson asked to replace his current counsel, claiming there had been a breakdown in communication. The district court granted his request but cautioned Williamson that further delays would not be tolerated.

About six months after that, the day Williamson's rescheduled trial was to begin, Williamson once again asked for a new attorney, again claiming a breakdown in communication and asserting he had retained different counsel who could be ready for trial in a few days. When the district court found that Williamson's assertion was false—he had not retained a new

attorney, although he had contacted one who said he would need at least six months to prepare for trial—the district court denied Williamson's motion. Williamson refused to go forward with his current attorney. The district court then ordered that Williamson would represent himself with his current attorney acting as standby counsel.

Day one of the trial went forward as scheduled: a jury was selected and sworn, and the court then recessed for the day. The next morning, Williamson, who was out on bond, did not appear for court. Williamson's sister informed the court that Williamson had been admitted to the hospital that morning with chest pains. The judge stated that he was "of th[e] opinion" that this hospitalization was consistent with Williamson's past efforts to delay the case. The court also expressed concern about the effect that a delay could have on Terrell Clark, Williamson's co-defendant (and nephew) who was to be tried jointly. Accordingly, the district court announced it was considering revoking Williamson's bond, declaring a mistrial, and severing Clark's trial from Williamson's. However, before doing so the court took a recess to allow the parties to gather more information about Williamson's condition and to consider the legal ramifications of the court's suggested actions.

During the hour-long recess, the parties confirmed that Williamson was, in fact, in the hospital, but could not obtain additional information. The prosecutor stated the government's position "that a mistrial is appropriate in this circumstance," and asked "the Court to ensure that the attorneys on Defense side agree with a mistrial and don't have a problem with it." Hearing no objection from either Williamson's standby counsel or Clark's counsel, the district court declared a mistrial. The district court also, at the request of the government, revoked Williamson's bond. Clark pleaded guilty a few months later.

Williamson was ultimately hospitalized for a few days recovering from what doctors diagnosed as a stroke. After his release from the hospital, Williamson was incapacitated and housed in an inpatient psychiatric ward for several weeks due to lingering mental and physical problems. These ongoing problems required a competency hearing before trial could go forward. Represented by new counsel and eventually found competent to stand trial, Williamson thereafter moved to dismiss the indictment on the grounds that the mistrial was improper and a retrial would constitute double jeopardy. The district court denied the motion.

After a multi-week trial, a jury convicted Williamson of all three conspiracy charges. The district court denied Williamson's post-trial motions to set aside the verdict or for a new trial. *See* Fed. R. Crim. P. 29, 33. This timely appeal followed.

## II. ANALYSIS

### A. Double Jeopardy

Williamson claims the district court improperly granted a mistrial, and therefore subjected him to double jeopardy. "We review *de novo* a district court's denial of a motion to dismiss on grounds of double jeopardy." *United States v. Gantley*, 172 F.3d 422, 427 (6th Cir. 1999). However, we review the district court's underlying decision to grant a mistrial for abuse of discretion. *United States v. Cameron*, 953 F.2d 240, 243 (6th Cir. 1992).

The Double Jeopardy clause of the Fifth Amendment protects a criminal defendant from being tried twice for the same offense. *United States v. Dinitz*, 424 U.S. 600, 606 (1976). In a jury trial, the right attaches from the moment the jury is sworn. *Fulton v. Moore*, 520 F.3d 522, 528 (6th Cir. 2008). However, if the district court declares a mistrial, the defendant may be retried despite the right's having attached. *Dinitz*, 424 U.S. at 606–07 (citing *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824)). The district court may declare a mistrial either with

the consent of the defendant or where "manifest necessity" existed. *Id.* at 607; *see also Watkins v. Kassulke*, 90 F.3d 138, 141 (6th Cir. 1996). The government argues that both alternatives were satisfied here, and therefore the double jeopardy bar does not apply.

### 1. Implied Consent

Neither Williamson nor his standby counsel explicitly consented to a mistrial. We may imply the defendant's consent to a mistrial based on his silence, but doing so is disfavored and may only be done after "an especially careful examination of the totality of the circumstances" that "positively indicate[] this silence was tantamount to consent." *Gantley*, 172 F.3d at 428–29.

Here, the court raised the possibility of a mistrial, but granted a recess so the parties could both confirm that Williamson was actually in the hospital and discuss the legal and strategic implications of a mistrial. Of particular importance to the district court was the effect a mistrial would have on Williamson's co-defendant, Terrell Clark, who was to have been tried jointly. The district court invited objection before granting the recess, and after returning from recess the government—which supported the mistrial—asked the court to note any objections from defense counsel before making its final ruling. Neither Clark, nor his counsel, nor Williamson's standby counsel objected to the mistrial, despite having had an opportunity to consider whether it should be granted. This all supports a finding of implied consent. *See id.* at 429.

Williamson now argues that his standby counsel did not have authority to consent to the mistrial on his behalf. Generally, consenting to a mistrial is a strategic decision that an attorney can make without asking for the defendant's input. *Watkins*, 90 F.3d at 143. But, by the district court's order, Williamson was representing himself at the time. It therefore seems doubtful, under the circumstances, that standby counsel could consent to a mistrial, as his job was merely to "aid the accused if and when the accused requests help, and to be available to represent the

accused in the event that termination of the defendant's self-representation is necessary." *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975). Moreover, the district court did not terminate Williamson's self-representation when he failed to appear for trial. And Williamson's standby counsel explicitly disclaimed having had any instruction from or contact with Williamson, and therefore stated before the recess that he had "no position" on whether a mistrial should be granted. Thus, while the district court gave those present an adequate chance to object, Williamson's absence and his standby counsel's apparent lack of authority to consent lead us to find that there was no implied consent for the mistrial.

*2. Manifest Necessity*

Without the defendant's consent, the mistrial was only permissible if "manifest necessity" existed. *See Dinitz*, 424 U.S. at 607. "In determining whether a 'manifest necessity' exists, Courts need not find an absence of alternatives but only a 'high degree' of necessity." *Klein v. Leis*, 548 F.3d 425, 431 (6th Cir. 2008) (citing *Ross v. Petro*, 515 F.3d 653, 660–61 (6th Cir. 2008)). We make this determination on a case by case basis in light of all the individual facts and circumstances, while giving "considerable deference" to the trial court's determination. *Johnson v. Karnes*, 198 F.3d 589, 594–95 (6th Cir. 1999). The trial court is not required to make an explicit, contemporary finding of manifest necessity, however, as long as the record provides sufficient justification for the ruling. *Arizona v. Washington*, 434 U.S. 497, 516–17 (1978).

We have previously held that a trial court may permissibly declare a mistrial when new circumstances require giving the defendant an extended continuance. For example, in *Fulton v. Moore*, after the jury was impaneled and sworn, the prosecution became aware that the date range alleged in the charging instrument was incorrect. 520 F.3d at 524. The trial court granted the prosecution's motion to amend the indictment, and declared a mistrial rather than granting an

open-ended continuance to allow the defendant adequate time to prepare his case in light of the changed indictment. *Id.* at 524–26. We found the record supported finding a high degree of necessity for the mistrial. *Id.* at 531. We also found that the trial judge acted appropriately in making his decision: he did not declare a mistrial abruptly, he implicitly considered a continuance as an alternative remedy, and he allowed the parties to object. *Id.* at 530; *see also id.* at 528 (discussing *United States v. Jorn*, 400 U.S. 470, 480–81 (1971)).

This case is similar. The district court here did not act abruptly: it raised the possibility of a mistrial, and granted the parties an hour-long continuance to verify Williamson's whereabouts and discuss any legal and strategic issues. The court specifically requested input from the parties, and after the government agreed that a mistrial was appropriate, it gave Clark's counsel and Williamson's standby counsel an opportunity to object. The court also considered alternatives, and declared a mistrial in an effort to ensure the efficient administration of justice in this case. The district court expressed concern that Williamson had previously engaged in dilatory tactics, thus suggesting that a mere continuance might not be a sufficient remedy if these practices persisted. The court further expressed concern about the potential prejudicial effect of a lengthy delay on Clark, Williamson's co-defendant. The mistrial here merely "act[ed] as an extended continuance" to accommodate the unexpected hospitalization of the defendant and what was possibly an attempt to "sabotage the government's case," rather than being for some impermissible purpose such as giving the government more time to strengthen its case. *See United States v. Stevens*, 177 F.3d 579, 587–88 (6th Cir. 1999).

Finally, Williamson has not alleged any specific prejudice from the mistrial. *See Washington*, 434 U.S. at 516 n.35. Almost four months passed after the hospitalization until Williamson ultimately went to trial. While the district court could not have known that the delay

would be this lengthy at the time it declared a mistrial, in hindsight such a long continuance would not have been practicable. *See Fulton*, 520 F.3d at 530 (defendant could not show prejudice because a continuance of six months was not a practicable alternative to declaring a mistrial). The delay further allowed for new counsel to be appointed, just as Williamson had requested before trial began, and obviating the need for Williamson to represent himself. Given these circumstances, there is no evidence that Williamson was actually prejudiced in any way by the delay.

**B. Sufficiency of the Evidence**

Williamson next challenges the sufficiency of the evidence as to all three of his convictions. "We review sufficiency of the evidence challenges de novo to determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Mathis*, 738 F.3d 719, 735 (6th Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Williamson raised this issue in the district court through a Rule 29 motion for judgment of acquittal, which the district court denied. We review the denial of the Rule 29 motion under the same standard.[1] *Id.* (citing *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012)). "In making this determination, however, we may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Id.* (citing *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)).

---

[1] Williamson simultaneously moved for a new trial under Rule 33, which the district court also denied. We review that ruling for abuse of discretion. *United States v. Sypher*, 684 F.3d 622, 626 (6th Cir. 2012). Because we find Williamson's convictions were supported by sufficient evidence, and nothing suggests they were against the great weight of the evidence, there was no error in denying his motion for a new trial on that basis. *See United States v. Poandl*, 612 F. App'x 356, 362–63 (6th Cir. 2015) (citing *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988)).

*1. Drug Trafficking Conspiracy*

Williamson raises two distinct challenges related to the evidence used to convict him of conspiracy to possess with intent to distribute and to distribute cocaine and marijuana. *See* 21 U.S.C. §§ 841(a), 846. First, that the evidence did not show a conspiracy, but simply a number of "buy-sell" transactions. Second, that the evidence at trial impermissibly varied from the indictment because it showed, at best, several smaller conspiracies.

"To sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must have proved: (1) an agreement to violate drug laws, in this case 21 U.S.C. § 841[(a)]; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009) (quoting *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)) (alteration omitted). "Proof of a formal agreement is not necessary." *Id.* (quoting *Martinez*, 430 F.3d at 330) (alteration omitted). Instead, "[t]he existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Id.* (quoting *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001)).

Here, there was more than sufficient evidence for the jury to have found that Williamson was involved in a single conspiracy. We have previously noted that a mere casual sale of drugs does not necessarily connect a buyer of drugs to a distribution conspiracy, because the sale does not necessarily prove the existence of an agreement. *See id.* at 680–81; *United States v. Anderson*, 89 F.3d 1306, 1310–11 (6th Cir. 1996). We consider several factors in determining whether a particular sale is part of a larger drug conspiracy, including: "the length of the relationship" between buyer and seller, "the established method of payment," "the extent to

which transactions are standardized," and "the level of mutual trust between the buyer and the seller." *Deitz*, 577 F.3d at 680–81.

The frequency and size of the transactions here, as well as the relationships between the co-conspirators, allowed the jury to infer a conspiracy beyond mere "buyer-seller" relationships. This drug trafficking organization operated for over a decade. Williamson regularly sent large amounts of cash—hundreds of thousands or even millions of dollars—to his suppliers in California and Arizona. In return, Williamson received several kilograms of cocaine or marijuana per shipment. At least some of the transactions were done on credit, where the drugs would be fronted and the proceeds from downstream sales remitted as payment. All this suggests a large, ongoing drug distribution conspiracy rather than a mere casual sale of drugs.

Williamson also objects that a "buy-sell" instruction was not given to the jury, but we find that "the proposed jury instruction did not substantially impair [his] defense." *United States v. Dado*, 759 F.3d 550, 568 (6th Cir. 2014). The trial evidence showed Williamson was the head of a substantial cocaine and marijuana distribution operation, not a casual buyer of the sort envisioned by our buyer-seller jurisprudence. Given such evidence, "[t]he inclusion of the buyer-seller jury instruction would not only have been unnecessary, but it likely would have been confusing to the jury." *Id.* at 569.

The evidence presented also does not show a fatal variance from the indictment. "A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006). "In conspiracy cases, 'a variance constitutes reversible error only if the indictment alleged one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies.'" *United States v.*

*Adams*, 722 F.3d 788, 805–06 (6th Cir. 2013) (quoting *Caver*, 470 F.3d at 235–36) (alteration omitted). In addition, the defendant must show that he was prejudiced by the variance. *Caver*, 470 F.3d at 235–36. Again, we review the evidence as to the number of conspiracies in the light most favorable to the government, considering "the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003).

Williamson says there was no single overarching conspiracy in this case. Instead, he argues that, at best, the evidence showed one conspiracy involving cocaine and a separate conspiracy involving marijuana. However, several witnesses testified to assisting Williamson in obtaining and distributing both marijuana and cocaine. Kendrah Smartt testified to taking cash to California and bringing back cocaine, and taking cash to Arizona and bringing back marijuana, all at Williamson's direction. Anthony Edwards testified to regularly and repeatedly helping Williamson obtain and distribute multiple kilograms of cocaine, and to knowing about and assisting with marijuana transactions. The jury could reasonably infer that Williamson was thus engaged in one large drug conspiracy, even if some of his associates worked solely on either marijuana transactions or cocaine transactions. A single conspiracy is not converted to multiple conspiracies "simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *United States v. Beals*, 698 F.3d 248, 259 (6th Cir. 2012) (quoting *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982)).

Furthermore, Williamson has not shown how the claimed variance was to his prejudice. Williamson's counsel argued the existence of separate conspiracies to the jury, and examined witnesses as to the overlap between Williamson's marijuana and cocaine businesses. Thus,

Williamson's ability to defend himself at trial was not impaired. *See United States v. Hynes*, 467 F.3d 951, 965 (6th Cir. 2006).

### 2. Money Laundering Conspiracy

Obtaining a conviction on the charge of conspiracy to commit money laundering required the government to prove beyond a reasonable doubt that Williamson knowingly entered into an agreement or understanding with at least one other person to commit money laundering. 18 U.S.C. § 1956(h); *Whitfield v. United States*, 543 U.S. 209, 212–14 (2005). So-called "promotional" money laundering—the type of money laundering at issue in this case—is defined as knowingly conducting "a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i). Using the cash obtained from selling drugs to buy more drugs for resale can constitute money laundering, as it uses the proceeds of drug trafficking to promote further drug trafficking. *United States v. Skinner*, 690 F.3d 772, 782 (6th Cir. 2012) (citing *United States v. Santos*, 553 U.S. 507, 525–26 & n.3 (2008) (Stevens, J., concurring); *United States v. Smith*, 601 F.3d 530, 544 (6th Cir. 2010)); *see also United States v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010) (describing this type of transaction as "[t]he paradigmatic example" of "promotional" money laundering).

That is exactly what the evidence showed in this case. Williamson received payment for selling drugs, and then arranged to have couriers like Kendrah Smartt and Doris Houchins deliver cash to his suppliers in California and Arizona so he could buy more drugs from them. Williamson himself was intercepted by law enforcement in Oklahoma with $1.5 million hidden in secret compartments in a van on his way to one such delivery. Given the large amounts of money transported and other evidence about Williamson's drug trafficking operation, the jury

could have reasonably inferred that this cash came from past drug sales. Williamson also extended cocaine on credit to one dealer—Gregory Jackson—who sold the drugs in Pennsylvania and then remitted a portion of his receipts to Williamson as payment so he could buy more drugs. The jury thus could have reasonably found that Williamson had at various times been on both sides of financial transactions using proceeds from drug sales to buy more drugs.

### 3. Firearm Conspiracy

Finally, Williamson challenges the sufficiency of the evidence used to convict him of conspiracy to possess a firearm in furtherance of drug trafficking. *See* 18 U.S.C. § 924(c). To prove this crime, the government must establish an agreement to possess a firearm, and a "specific nexus between the gun and the crime charged," *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001), here conspiracy to possess with the intent to distribute and to distribute cocaine and marijuana. It is not necessary that the gun be brandished or used during the commission of a drug offense, but it must "advance, promote, or facilitate the crime." *United States v. Street*, 614 F.3d 228, 236 (6th Cir. 2010) (quoting *United States v. Paige*, 470 F.3d 603, 609 (6th Cir. 2006)). Merely possessing a gun on the same premises as a drug transaction does not itself suffice unless the government can establish this nexus. *United States v. Barnes*, 822 F.3d 914, 919 (6th Cir. 2016) (citing *Mackey*, 265 F.3d at 462). However, "a jury can reasonably infer that firearms which are strategically located so as 'to provide defense or deterrence in furtherance of the drug trafficking' are used in furtherance of a drug trafficking crime." *United States v. Couch*, 367 F.3d 557, 561 (6th Cir. 2004).

Williamson was connected to several guns at trial. First, a search of the van Williamson was driving when stopped in Oklahoma in January 2005 uncovered $1.5 million in cash and two

loaded handguns hidden in a secret compartment. Williamson and the other occupants of the van were transporting the cash to California where they intended to use it to purchase cocaine. Drug dealers often carry guns to protect themselves and their drugs or cash, suggesting that the firearms found in the van were made readily available for the purpose of facilitating the planned drug purchase. *See Street*, 614 F.3d at 236.

A loaded revolver was found underneath a chair during a 2011 search of the "lounge" area of The Factory—the warehouse that served as Williamson's base of operations. The search also uncovered a plastic bag containing ammunition and firearms magazines. The jury heard considerable testimony about drug transactions that took place at The Factory, and drug paraphernalia was found during the search—including scales and materials to wrap packages of marijuana. Again, drug dealers are well known to keep guns in the locations where they sell drugs to protect themselves and their operation. *See Couch*, 367 F.3d at 561 (guns found in defendant's garage, where his drug transactions were known to occur and where evidence of drug dealing was uncovered, could support a conviction under 18 U.S.C. § 924(c)). And Williamson was the only person with a key to The Factory.

Additionally, two cooperating witnesses testified to their own interactions with Williamson when he possessed or planned to possess firearms to further his drug trafficking operation. Doris Houchins, Williamson's ex-girlfriend and occasional courier, recounted an incident where Williamson found some counterfeit bills among a stack of cash he had received from a lower-level dealer. Houchins described driving Williamson to his sister's house, where he picked up a handgun, before continuing on to the dealer's house where Williamson confronted the dealer. The jury also heard a recorded phone call in which Anthony Edwards told Williamson that he had hidden a bag containing three or four guns in his garage. Williamson

planned to pick up the guns from Edwards the next day, but before he could do so, another co-conspirator, Dennis Tate, disposed of them.  Either of these incidents alone could have allowed the jury to reasonably infer that Williamson agreed with his co-conspirators to possess firearms, and that they did so for the purpose of furthering their drug trafficking enterprise.

## C. Lay Opinion Testimony

Williamson next argues that one witness—Dwayne Robinson, a Detroit police officer—inappropriately provided lay opinion testimony by interpreting the meaning of recorded phone calls between co-conspirators.  Because Williamson did not object to this testimony, we review its admission for plain error.  *United States v. Martin*, 520 F.3d 656, 658 (6th Cir. 2008); Fed. R. Crim. P. 52(b).  Under the plain error standard, we may reverse if Williamson shows (1) there was error, (2) that was plain, (3) that affected a substantial right, and (4) that substantially affected the fairness or integrity of the judicial proceedings.  *Martin*, 520 F.3d at 658; *see also United States v. Olano*, 507 U.S. 725, 732 (1993).

Robinson was a Detroit police officer who was assigned to the FBI's violent gang and violent crime task force.  Along with a DEA officer, Robinson was in charge of the Williamson investigation.  In that role, Robinson personally surveilled Williamson, which included monitoring live footage from the pole camera outside The Factory, listening to wiretaps, and following vehicles that departed The Factory.  He also coordinated the activities (including surveillance) of other law enforcement officers.

At trial, Robinson testified about the investigation's surveillance activities.  Part of that testimony included establishing a foundation for the government to introduce video recordings from the pole camera outside The Factory, and wiretaps from phone calls between Williamson and his co-conspirators.  A portion of Robinson's testimony centered on the January 2011

incident when Williamson and Edwards sold four kilograms of cocaine to Jones, who in turn sold it to Sheppard, who was subsequently arrested following a car chase. The police had tapped Edwards's phone, and recorded him talking to Jones and Williamson both before and after the transaction. Robinson testified as to the meaning of these calls—both interpreting certain ambiguous phrases, and opining on the import of the calls.

Williamson says that Robinson's twice-made statement during this testimony that he listened to "over thousands of phone calls" during the course of the investigation was impermissible since the jury only heard a small number of those calls. Williamson says this statement implied that Robinson could better understand the content of the calls than the jury could, even though most of the calls were in plain English. When Robinson then "interpreted" the meaning or import of the calls, he usurped the fact-finding function of the jury, according to Williamson.

Federal Rule of Evidence 701 allows non-experts to give "testimony in the form of an opinion" only to the extent the testimony "is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of [Federal] Rule [of Evidence] 702." "The function of lay opinion testimony is to 'describe something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'" *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015) (quoting *United States v. Freeman*, 730 F.3d 590, 595–96 (6th Cir. 2013)). "Courts often qualify law enforcement officers as *expert witnesses* under Rule 702 to interpret intercepted conversations that use 'slang, street language, and the jargon of the illegal drug trade.' In contrast, when an

officer is *not* qualified as an expert, the officer's lay opinion is admissible 'only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred.'" *Id.* (quoting *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001)). The burden is on the proponent of the testimony—here, the government—to show the testimony meets the foundational requirements of Rule 701. *Freeman*, 730 F.3d at 595–96.

We have previously criticized law enforcement officers who offer lay opinion testimony to interpret recorded calls for a jury. In *United States v. Freeman*, the government's case agent reviewed approximately 23,000 calls between and among various defendants, and based on that review gave opinion testimony about the meaning of 77 calls introduced at trial. We determined that when an agent "provides interpretations of recorded conversations based on his knowledge of the entire investigation," he might impermissibly testify "based upon information not before the jury," which can lead the jury to think the agent has important knowledge about the case that they do not. *Id.* at 596 (quoting *United States v. Hampton*, 718 F.3d 978, 982–83 (D.C. Cir. 2013)). In *Freeman*, the agent's testimony was based not on his own first-hand observations, but rather on the collective knowledge obtained by officers throughout the course of the investigation. *Id.* at 596. He never specified any personal experiences that could have formed the basis for his opinion, instead relying on speculation and hearsay, and thus "lacked the first-hand knowledge required to lay a sufficient foundation for his testimony under Rule 701(a)." *Id.* at 597. Furthermore, we found it was not helpful to the jury (under Rule 701(b)) to speculate or "spoon-fe[e]d his interpretations of the phone calls and the government's theory of the case to the jury." *Id.* Jurors are competent to understand the meaning of recorded conversations that use "ordinary language." *Id.* at 597–98. In *Freeman*, the agent "merely t[old] the jury what result to

reach." *Id.* at 597 (quoting *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1272 (6th Cir. 1988)). "At that point, his testimony is no longer evidence but becomes argument." *Id.* at 598.

Unlike *Freeman*, in this case Robinson was intimately involved in the investigation of Williamson. Although he testified that he had listened to "over thousands of phone calls" and often used the pronoun "we" when discussing the investigation, he made clear his active role in the surveillance. He listened to many of the calls as they were happening, spent hours watching the live feed from the pole camera, personally interacted with witnesses and informants, and coordinated a team of law enforcement officers carrying out the investigation. He had the first-hand knowledge necessary to give lay opinion testimony. *See Kilpatrick*, 798 F.3d at 381 (distinguishing *Freeman* for similar reasons).

Much of Robinson's opinion testimony as to these calls constituted permissible identifications—explaining to the jury whom the voices on the calls belonged to, and what the investigation had revealed their roles in Williamson's enterprise to be. *See id.* at 383–84. Williamson has not contested the accuracy of these identifications or descriptions, and therefore has failed to show how these statements were prejudicial even if there were some error in admitting them. *See id.*

Other parts of Robinson's testimony constituted permissible interpretations of ambiguous phrases. For example, he explained that the phrase "four of them" in one conversation meant four kilograms of cocaine, that "32,5" meant the price was $32,500 per kilogram, and that the phrase "splitting the pros" in a subsequent conversation indicated an intent to split the profits from the sale. Robinson explained that he knew this based on the context of the conversation and his personal experience in the investigation, including through simultaneous surveillance of the conspirators and listening to their other intercepted phone calls. Williamson had access to all

these recorded phone calls, and was free to challenge the accuracy of Robinson's interpretation of these ambiguous phrases through cross-examination. *See id.* at 383.

However, other parts of Robinson's testimony crossed the line into impermissible territory. Several times, the prosecutor asked Robinson to explain "the importance" or "the significance" of a particular phone call he had just played for the jury, which led to Robinson giving narrative statements about the content of the conversation and what the conspirators accomplished with it. For example, he interpreted one call to be Jones and Edwards arguing about the price of the cocaine. The government does not argue that the jury could not have determined this for itself once Robinson identified the speakers. Similarly, Robinson summarized the content of calls between Edwards and Williamson occurring after Sheppard had been arrested, even though the government has not asserted that there was any coded language in them. In one long exchange after a short recess, Robinson summarized all of the calls that had been played to the jury up to that point, including opining about who was supplying cocaine to whom, and on what terms. That egregious "spoon-feeding" of the government's theory of the case to the jury is exactly what *Freeman* warns against.

But even if the admission of these portions of Robinson's testimony was plain error, it was not substantially prejudicial. Edwards testified after Robinson about the calls he had participated in, and his explanations for the calls square with Robinson's summaries. Furthermore, the overwhelming amount of other evidence about this particular incident—the contemporaneous video surveillance showing the movements of Williamson; the cocaine seized from Sheppard; the testimony from co-conspirators and other police officers involved in the arrest—conclusively tied Williamson to this particular cocaine deal, and to the drug trafficking enterprise as a whole. *See United States v. Miller*, 738 F.3d 361, 373–74 (D.C. Cir. 2013). And

even if this one cocaine deal were excised from the trial, there would still be more than enough evidence of other drug trafficking, money laundering, and firearms possession to have convicted Williamson on all the charges.

Furthermore, the district court also provided an appropriate limiting instruction, cautioning the jury about Robinson's dual role as fact and opinion witness. *See* Sixth Cir. Pattern Crim. Jury Instructions 7.03A (2015). In the jury instructions, the court explained that Robinson "testified to both fact and opinions," that they "don't have to accept [his] opinion" and that they should evaluate his credibility for both the facts and opinions he testified to. The court further instructed that the weight they would give his testimony "should consider [his] qualifications and how he reached his conclusions." Lack of such an instruction may require reversal, *e.g.*, *United States v. Lopez-Medina*, 461 F.3d 724, 743–45 (6th Cir. 2006), but giving this cautionary instruction does not necessarily cure error in admitting the testimony in the first place. Still, it diminishes the likelihood that the jury erroneously relied on Robinson's lay opinion testimony in reaching its verdict.

In sum, the admission of most of Robinson's testimony about these phone calls was not plainly erroneous. And to the extent his testimony was improper under Rule 701, it was not substantially prejudicial and thus does not satisfy the plain error standard.

**D. Improper Vouching**

Finally, Williamson claims the prosecutor impermissibly vouched for the credibility of a cooperating witness by asking questions about the provision of her plea agreement requiring truthful testimony in exchange for a possible lower sentence. The witness, Kendrah Smartt, testified to having been a courier for Williamson, taking cash to California and Arizona and

bringing drugs back to Detroit from those states. After testifying about some of these trips during direct examination, she and the prosecutor engaged in the following exchange:

> Q: Now, let me ask you this. You signed a cooperation agreement and plead guilty, right?
>
> A: Yes.
>
> Q: Now, under the cooperation agreement, is it your understanding that the Government will let the Court know of your cooperation and testimony, right?
>
> A: That's my understanding.
>
> Q: Right. Even though the Judge is right here, of course—
>
> A: Exactly.
>
> Q: —and sees you. And if you cooperate truthfully and testify truthfully, you may get a lower sentence, correct?
>
> A: Yes, I'm just here to tell the truth.
>
> Q: Right. But you understand that it's Judge O'Meara's decision as to what your sentence is?
>
> A: Yes.

The written cooperation agreement was then admitted into evidence without objection.

A form of prosecutorial misconduct, "[i]mproper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). If the prosecutor's conduct was improper, "we must determine whether the impropriety was sufficiently flagrant to warrant reversal." *United States v. Reid*, 625 F.3d 977, 982 (6th Cir. 2010). Because Williamson did not object to the prosecutor's questions, we review his claim of improper vouching for plain error. *United States v. Owens*, 426 F.3d 800, 806 (6th Cir. 2005). Once again, reversal under this standard requires Williamson to show (1) an error, (2) that is plain, (3) that affected a substantial

right, and (4) that substantially affected the fairness or integrity of the judicial proceedings. *Id.*; *see Olano*, 507 U.S. at 732.

It is not improper vouching to tell the jury that the plea agreement contains a truthfulness provision and that the court will ultimately select the witness's sentence after evaluating her truthfulness. *Reid*, 625 F.3d at 983–84. However, a "potential for impropriety emerges . . . when a prosecutor explains that there is to be a recommendation to the witness's sentencing court whether the terms of the plea agreement has been adhered to," as it may imply the prosecutor knows whether the witness is lying. *Francis*, 170 F.3d at 550.

Because the prosecutor's questions here clearly are not sufficiently flagrant to warrant reversal, we need not decide if they constituted impermissible vouching. We consider four factors in assessing flagrancy: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally placed before the jury; (4) the strength of the evidence against the accused." *United States v. Fullerton*, 187 F.3d 587, 592 (6th Cir. 1999) (citing *United States v. Carroll*, 26 F.3d 1280, 1384–85 (6th Cir. 1994)).

The contested questions did not mislead the jury or prejudice Williamson. The prosecutor permissibly noted that the court would select Smartt's sentence. Additionally, the questions were isolated—the prosecutor did not mention Smartt's plea agreement during his opening or closing statements.[2] *Cf., e.g.*, *United States v. Wells*, 623 F.3d 332, 342–44 (6th Cir. 2010); *Carroll*, 26 F.3d at 1387–89. Furthermore, Smartt's testimony was only a piece of the extensive evidence against Williamson, including the testimony of several other co-conspirators, recorded surveillance, and seized physical evidence. *See Wells*, 623 F.3d at 344; *Owens*,

---

[2] Of note, however, defense counsel did refer to Smartt's plea agreement during his closing argument, to impeach her credibility by suggesting that the cooperation provision gave her an incentive to lie.

426 F.3d at 808.  Accordingly, even if the prosecutor's statement constituted improper vouching,

and that is a debatable point at best, because it was not flagrant no plain error occurred.

### III. CONCLUSION

For these reasons, we affirm Williamson's convictions.