NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0488n.06

Case No. 23-1454

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 04, 2024
KELLY L. STEPHENS, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ARNON JUSTIN LAKE,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

OPINION

Before: KETHLEDGE, THAPAR, and LARSEN, Circuit Judges.

THAPAR, Circuit Judge. At Arnon Lake's trial, several law enforcement officers testified about Lake's text messages and phone calls. Lake argues that the district court shouldn't have allowed these officials to interpret the coded language in his drug-laden communications. And without this testimony, Lake contends, there was insufficient evidence to convict him of various drug and gun offenses. Lake also asserts there was insufficient evidence to impose a two-level enhancement for maintaining a premises to manufacture or distribute drugs (the "drug-premises" enhancement). We affirm.

I.

This case began when Arnon Lake, a drug courier, got caught up in an ongoing police investigation of his boss, a drug dealer named John Humphrey. The Lansing Police Department

and Drug Enforcement Administration ("DEA") listened to Humphrey's phone calls and captured several interactions with Lake.

For instance, Humphrey tasked Lake with picking up five pounds of methamphetamine from a supplier's stash house and reminded Lake to bring his pistol. On-the-ground surveillance showed that Lake went to the stash house and retrieved a package. The next day, Humphrey and another individual stopped by Lake's house and left with "pockets bulging." R. 1, Pg. ID 150. Other calls confirmed that the package contained "ice," a code word for methamphetamine.

Lake also helped prepare drugs for distribution and consumption. The police listened to calls where Humphrey taught Lake how to mix heroin with other substances. And Lake left notes to his girlfriend about how to blend drugs to get them ready for sale.

After a month of listening to Humphrey and Lake's calls, the police searched Lake's house. There, they found heroin, a blender, digital scale, cutting agents, plastic baggies, individual bundles of drugs, lottery tickets, over $6,000 in cash, ten guns, ammunition, and body armor. And at the stash house nearby, they found 6.2 kilograms of crystal methamphetamine and 2.45 grams of fentanyl. The government charged Lake with conspiracy to distribute methamphetamine, heroin, and fentanyl; possession of heroin with intent to distribute; and possession of a gun in furtherance of a drug trafficking crime.

At trial, three law enforcement officials testified about Lake's conversations. Two officers, Greg Parrott and Patrick Muller, testified as lay witnesses. They explained their roles in the investigation—as lead case agent and cell phone analyst, respectively—and gave background information about Lake's phone calls and text messages. They also offered interpretations of Lake's communications. The third official, DEA Special Agent Alexis Giudice, testified as an expert. She gave background information on the drug trade and defined the jargon that Lake used.

The jury convicted Lake on all counts and the court sentenced him to 181 months in prison. Lake now appeals the admission of the officers' testimony, contests the sufficiency of the evidence, objects to the application of the drug-premises enhancement, and claims ineffective assistance of counsel.

II.

Lake first argues that the trial court should've sua sponte excluded police officer testimony about Lake's communications. In Lake's view, Officer Parrott, Officer Muller, and Agent Giudice gave "conclusory" interpretations of the "cryptic language" in Lake's texts and calls and "spoon-fed" conclusions to the jury. Appellant Br. at 9, 17 (citation omitted). Lake didn't object at trial, so plain error governs our review. *See United States v. Akridge*, 62 F.4th 258, 263–64 (6th Cir. 2023).

Lake brings objections to Officers Parrott and Muller as lay opinion witnesses and Agent Giudice as an expert witness, so we'll address each in turn.

A.

To be admissible, lay opinion testimony must meet three hurdles. It must be "rationally based on the witness's perception"; "helpful" to "understanding the witness's testimony or to determining a fact in issue"; and "not based on scientific, technical, or other specialized knowledge within the scope" of expert knowledge. Fed. R. Evid. 701.

So, what does this mean in the context of officer testimony about a defendant's communications? First, an officer can testify about communications only when he has been personally involved in the investigation. *See United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015). The officer must participate in the conversation, know about the facts being relayed in the conversation, or have observed the conversation as it occurred. *Id.* That way, the officer's

testimony is based on his "perception." *See* Fed. R. Evid. 701(a). By contrast, an officer can't give testimony based on "generic information," such as general knowledge of the police department. *United States v. Freeman*, 730 F.3d 590, 596 (6th Cir. 2013).

But even when an officer has sufficient personal knowledge, there are additional limits. First, the testimony must help the jury. *See* Fed. R. Evid. 701(b). An officer's interpretation is helpful when the testimony involves "street language," but not when the testimony involves plain English. *United States v. Hall*, 20 F.4th 1085, 1101–02 (6th Cir. 2022). And second, the officer can't tell the jury what inferences to draw from the defendant's communications or repeat the government's theory of the case. That "crosses the line from evidence to argument." *Kilpatrick*, 798 F.3d at 381. Third, the officer's lay testimony can't be based on scientific, technical, or other specialized knowledge. *See* Fed. R. Evid. 701(c). Otherwise, lay witnesses could circumvent the requirements that apply to experts under Rule 702. *See Kilpatrick*, 798 F.3d at 381.

In sum, our precedent applying Rule 701 makes clear that police officers testifying as lay witnesses must (1) base their testimony on personal, not expert, knowledge, (2) avoid interpreting plain English, and (3) refrain from arguing the prosecution's case. Testimony that interprets cryptic language satisfies Rule 701 when it's based on personal knowledge. *Id.* at 380; *Freeman* 730 F.3d at 598.

## B.

Officers Parrott and Muller met the requirements for lay opinion witnesses under Rule 701. First, they had personal knowledge. Officer Parrott served as case agent for the entire investigation, which this court has held gives a witness personal knowledge. *See United States v. Young*, 847 F.3d 328, 351 (6th Cir. 2017). Indeed, Officer Parrott had "all operational control" and "conduct[ed] the operations and almost all [associated] paperwork." R. 461, Pg. ID 3360. He

oversaw "documenting, directing, [and] getting updates on each aspect of the case." R. 462, Pg. ID 3467. Officer Muller likewise satisfied the personal knowledge requirement. He extracted and analyzed Lake's cellphone data, including his text messages.

Lake relies on *Freeman* to argue that Officers Parrott and Muller's testimony was improper. But in that case, the officer never specified whether he participated in surveillance, or any other activity related to capturing the recordings. *See* 730 F.3d at 597. Instead, the officer relied on "references to the investigation as a whole." *Id.* at 596. Here, however, Officers Parrott and Muller played primary investigatory roles.

Lake also claims that some of Parrott and Muller's testimony violated Rule 701 by spoon-feeding conclusions to the jury. These arguments aren't compelling. We address each in turn.

*Officer Parrott.* The first piece of allegedly improper testimony occurred on direct examination, when the prosecution asked Parrott about a phone call between Lake and Humphrey. During the call, Lake asked, "When, when you go back down the way? You gonna go back down there soon[?]" R. 498-1, Ex. 17, Pg. ID 4345. Humphrey responded that he "need[ed] to go back soon" and that he "still got like a hundred and twenty grams, and these bitches still fire." *Id.* Humphrey also said that he "need[ed] help getting these bitches off if you could get some of um for like fifty." *Id.*

After playing this recording to the jury, the government asked Officer Parrott how "this call impact[ed] [his] investigation." R. 462, Pg. ID 3484. Officer Parrott explained that the call "confirmed that John Humphrey was getting heroin from Chicago, and we identified Arnon Lake as being the individual that was trafficking heroin with him." *Id.* Lake objects that Officer Parrott improperly drew conclusions from the plain English used in this call.

The district court didn't plainly err by declining to sua sponte strike Parrott's testimony. Officers are free to offer background information about their investigations, such as how they identified suspects, what role those suspects played, and why they took certain steps during an investigation. *Kilpatrick*, 798 F.3d at 381–82; *United States v. Williamson*, 656 F. App'x 175, 187 (6th Cir. 2016); *United States v. Robinson*, 872 F.3d 760, 775–76 (6th Cir. 2017). That's what Parrott did here, explaining that this call led to the identification of Lake and continued investigation of his ties with Humphrey. Indeed, Parrott was responding to a question about how "this call impact[ed] [his] investigation." R. 462, Pg. ID 3484.

Lake, for his part, argues that Parrott drew conclusions for the jury: that Humphrey trafficked heroin and that Lake trafficked heroin, too. *See Williamson*, 656 F. App'x at 188. But we're reviewing for plain error. If Lake had objected at trial, then the government would've had a chance to respond that Officer Parrott was offering permissible background information. The trial court didn't plainly err by failing to make Lake's arguments for him.

Lake next objects to Parrott's testimony on cross-examination. Lake argues that because he didn't explicitly mention methamphetamine, heroin, or fentanyl, Parrott shouldn't have opined that Lake's communications referred to those drugs.

But Parrott was interpreting the meaning of Lake's cryptic language in light of the whole investigation. When pressed by Lake's counsel, Parrott explained that "the totality of the conversation and whatnot" indicated that Lake was discussing drugs. R. 462, Pg. ID 3536. And Parrott added that the "other calls we heard" also supported this inference. *Id.* at 3538. Again, the meaning of these calls was unclear on their face. Indeed, Lake seems to concede as much by calling his communications "ambiguous." Appellant Br. at 18.

The upshot? This is exactly the kind of testimony we have permitted, where an agent "uses h[is] personal knowledge of the case to interpret cryptic language." *Kilpatrick*, 798 F.3d at 380. It also differs from the improper testimony in *Freeman*, where the witness instructed the jury what "inferences to draw from recorded conversations involving ordinary language." *Id.* at 380–81 (quoting *Freeman*, 730 F.3d at 598). In short, the district court didn't plainly err by failing to exclude Officer Parrott's lay testimony.

*Officer Muller*. Lake also objects to Officer Muller's testimony. At trial, the government presented a text from Lake that read, "My bad, the old bag 27.3 dressed up." R. 463, Pg. ID 3791–92. The government then asked Muller if there was any significance to the 27.3 number. Muller responded that 27.3 was significant because "28 grams would be an ounce of narcotics, or just an ounce in general." *Id.* at 3792. On appeal, Lake objects for the first time to this answer. He asserts that Muller failed to explain why or how he drew that conclusion.

But we've approved of nearly identical testimony. In *Williamson*, an officer gave interpretations of various numbers in phone calls—that "four of them" meant "four kilograms of cocaine" and that "32,5" meant a price of "$32,500 per kilogram." 656 F. App'x at 188. Because the officer explained his personal involvement in the investigation, there was no problem under Rule 701. *Id.* That's what happened here. As explained above, Muller had a personal involvement in the investigation—he performed the extraction analysis on Lake's phone. Muller largely relayed the content of Lake's text messages without commentary. But he did offer interpretations of otherwise unclear numbers, just like the officer in *Williamson*.

Finally, Lake objects to Muller's repeated characterizations of his texts as "appearing" to concern narcotics. Lake first alleges that Muller failed to explain why Lake's texts necessarily concerned narcotics. But elsewhere in his briefing, Lake concedes that his messages "strongly

suggested narcotics sales and distribution." Appellant Br. at 5. Lake has a back-up argument: Muller never clarified why the texts referred to narcotics, as opposed to marijuana. But Muller was entitled to offer his interpretation of Lake's ambiguous texts since they fell within his personal experience.

C.

Lake also challenges DEA Special Agent Alexis Giudice's expert testimony. Agent Giudice gave background information on the drug trade and defined the drug-trafficking jargon in Lake's communications. Lake seems to fault Giudice for her conclusions about "specific 'lingo' used in the intercepted calls" because she wasn't a part of the investigation. Appellant Br. at 13 (citation omitted).

But Lake gets the law wrong here. Expert witnesses "may rely on knowledge outside their own personal knowledge when testifying on 'scientific, technical, or other specialized knowledge.'" *United States v. Blackwell*, 459 F.3d 739, 754 (6th Cir. 2006) (citation omitted). And courts "often qualify law enforcement officers as expert witnesses under Rule 702 to interpret intercepted conversations that use 'slang, street language, and the jargon of the illegal drug trade.'" *Kilpatrick*, 798 F.3d at 379 (citation omitted) (emphasis omitted); *United States v. Maya*, 966 F.3d 493, 505 (6th Cir. 2020). Here, that's precisely what Giudice did. She interpreted drug lingo like "ice," "fire," "fet," and "shaky." R. 461, Pg. ID 3401–03, 3436. And as an expert witness under Rule 702, Giudice didn't need personal knowledge of the calls. Her testimony was therefore permissible.

D.

Further, even if the officers' testimony strayed past the bounds of Rules 701 and 702, Lake must demonstrate that their testimony prejudiced him to show plain error. *See* Fed. R. Crim. P.

52(a). He cannot. First, the wiretap and cellphone evidence were themselves admissible. So Lake's communications, along with the police surveillance and drug evidence found at his house, provided ample basis for the jury to infer Lake's involvement in a drug trafficking organization. Second, the lay officer witnesses testified *after* Agent Giudice gave her expert testimony on drug-related lingo. So even if Officers Parrott and Muller pushed the boundaries of lay opinion testimony, the government properly introduced the same testimony through Agent Giudice. Third, many statements that Lake now objects to were elicited on cross-examination, which counsels against a finding of plain error. *See Ohler v. United States*, 529 U.S. 753, 755 (2000); *United States v. Van Der Ent*, 52 F. App'x 793, 795 (6th Cir. 2002). Altogether, Lake can't show that allowing this testimony was plain error.

## III.

Next, Lake brings a sufficiency-of-the-evidence challenge. He claims there was insufficient evidence to convict him of (1) conspiracy to distribute methamphetamine, heroin, and fentanyl; (2) possession of heroin with intent to distribute; and (3) possession of a gun in furtherance of a drug trafficking crime.

We review Lake's sufficiency challenge in the light most favorable to the government. *United States v. Wright*, 774 F.3d 1085, 1088 (6th Cir. 2014). We reverse only if no rational jury could find the elements of the crime satisfied beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Lake hasn't made that showing.

## A.

To convict Lake of conspiracy to distribute controlled substances, the government needed to prove "(1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy;

and (3) participation in that conspiracy." *United States v. Rosales*, 990 F.3d 989, 994 (6th Cir. 2021).

Lake argues he couldn't be found guilty of conspiracy to distribute these substances because no methamphetamine or fentanyl were discovered at his house. Lake also alleges that there was no direct evidence of his membership in a conspiracy.

But there are several problems with this logic. First, possession isn't an element of conspiracy. So, it doesn't matter that the police didn't find methamphetamine or fentanyl in his house.

Second, consider the other undisputed physical evidence found at Lake's house. In Lake's basement, police found a digital scale, blender, clear plastic bags (some containing a powdered substance), and lottery tickets, all by a workbench. They also found Sleepinol and Mannitol, which are commonly used to "cut" other drugs to increase a dealer's profit margins. In Lake's kitchen, they found more plastic bags (some with heroin inside), Tramadol (another drug), and lottery ticket bundles. And throughout Lake's house, police found loaded guns, a bulletproof vest carrier, ammunition, and cash. A jury could reasonably conclude that Lake participated in a drug conspiracy based on these findings.

Moreover, Lake's conversations showed his willing participation in a conspiracy. In one call with Humphrey, Lake agreed to (1) crush "them" down in a blender, (2) manually crush "them" with a credit card, (3) take "that dub" and "throw like five grams of the white fet on it," (4) ensure that there were no "sweet spots," (5) get a "read on the street" to see how customers liked it, (6) and charge more "[i]f that shit is fire." R. 498-3, Ex. 39, Pg. ID 4357–59. We doubt Lake was selling Girl Scout cookies and so could a rational jury.

Police surveillance also corroborated Lake's participation in the conspiracy. Humphrey asked Lake to pick up five pounds of what later calls confirmed was ice. Police then tailed Lake as he drove to a stash house, retrieved a package from the stash house, and returned home. Later, Humphrey visited Lake and left with "pockets bulging." R. 1, Pg. ID 150. And police seized 6.2 kilograms of crystal methamphetamine and 2.45 grams of fentanyl from the stash house Lake visited.

Even the cryptic messages support Lake's convictions. For instance, Lake left a note on his phone to his girlfriend captioned "[t]here are things of value to get rid of." R. 463, Pg. ID 3818. Those "things" included "[m]y precious guns" and the "stuff packed up," which consisted of "1500 in one bag and 450 in another." *Id.* Lake continued: "Those 30 can be turned into 90, then it's 100 for each one. So you know what everything is worth." *Id.* Given the wiretap evidence and drug paraphernalia recovered at Lake's house, the jury could've interpreted Lake's note as telling his girlfriend how much she could sell his drugs for.

All told, there was plenty of evidence that could've led a jury to convict Lake of conspiring to distribute controlled substances.

B.

Next, to convict Lake of possession of heroin with intent to distribute, the government needed to show that Lake (1) knowingly possessed heroin and (2) intended to distribute the heroin. *See United States v. Garth*, 965 F.3d 493, 496 (6th Cir. 2020). The government made both showings.

To see why, recall the physical evidence found at Lake's house: a scale, blender, clear plastic bags (some with heroin inside), lottery tickets, cutting agents, Tramadol, loaded guns, ammunition, and cash. That's more than enough to establish knowing possession.

To be sure, the police only found a small amount of heroin in Lake's possession (2.05 grams). But they found other items that suggested distribution: baggies, a scale, blender, cutting agents, and lottery tickets. An "intent to distribute can be inferred from . . . other evidence indicating the substance possessed was not intended for personal use." *Id.* Individually packaged drugs suggest distribution, not consumption. And finally, Lake's communications bolster an intent to distribute.

Lake responds that the wiretap and cellphone evidence didn't explicitly discuss methamphetamine, heroin, or fentanyl. So, his messages "asking for numbers, responding with certain numbers" are too cryptic to support a conviction or could've concerned marijuana. Appellant Br. at 10 (quoting R. 463, Pg. ID 3810–13); *see* Reply Br. at 3. But coded language isn't a get-out-of-jail-free card. Otherwise, all but the most naïve drug dealers could defeat criminal charges by speaking in euphemisms.

C.

Because sufficient evidence supports the jury's finding that Lake committed the drug trafficking offenses, his conviction for possession of a gun in furtherance of drug trafficking crimes also passes muster. Lake doesn't contest that the police found ten guns at his house. And Lake discussed bringing his "stick" with him to retrieve the package from the stash house. R. 462, Pg. ID 3541. Thus, a jury could have found that he possessed a gun in furtherance of his trafficking offenses.

IV.

Over Lake's objection, the district court applied a two-level sentencing enhancement for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance."

U.S.S.G. § 2D1.1(b)(12). Lake presses that objection here, arguing that the application of this drug-premises enhancement was clear error. It wasn't.

The drug-premises enhancement applies when one of the "primary or principal uses for the premises" was manufacturing or distributing drugs. U.S.S.G. § 2D1.1(b)(12) cmt. 17. "This is a relatively low bar." *United States v. Leggett*, 800 F. App'x 378, 381 (6th Cir. 2020). Evidence of drug storage or transactions typically supports applying this enhancement—but "so too will a litany of circumstantial evidence showing drug production on the premises." *United States v. Bell*, 766 F.3d 634, 638 (6th Cir. 2014). For instance, "tools of the trade," like laboratory equipment, scales, guns, ammunition, packaging materials, and cash, support a finding that the premises were maintained for manufacturing and distributing drugs. *United States v. Verners*, 53 F.3d 291, 297 (10th Cir. 1995).

Ample evidence supports the district court's application of the drug-premises enhancement here. Police documented a digital scale, blender, plastic baggies, a powdered substance, lottery tickets, over $6,000 in cash, and significant amounts of cutting agents by a workbench in Lake's basement. They found more baggies, heroin, Tramadol, and lottery tickets in the kitchen. The heroin was mixed with six other substances, suggesting that Lake was preparing it for sale. Lake also possessed several loaded guns, body armor, and hundreds of rounds of ammunition.

All these "tools of the trade" indicate that Lake used his residence for manufacturing and distributing drugs. *See Bell*, 766 F.3d at 637 (holding that a digital scale, drug-packaging materials, police scanners, and cash found in the defendant's house, as well as guns and drugs found in the defendant's truck, supported the drug-premises enhancement). The government also presented evidence that Lake stored methamphetamine in a cooler in his garage. And the drug-premises enhancement covers "storage of a controlled substance." U.S.S.G. § 2D1.1(b)(12) cmt. 17.

Lake, for his part, characterizes his drug paraphernalia as suggestive of "personal use." Appellant Br. at 30. He maintains that there was "no proof whatsoever of any controlled purchases, distribution, or manufactur[ing]" at his house. *Id.* at 29. The drugs, baggies, scales, blenders, cash, cutting agents, and lottery tickets show otherwise.

Given the abundant evidence recovered at Lake's house, the district court didn't err—let alone clearly so—in applying the drug-premises enhancement.

V.

Finally, Lake contends that his lawyer was ineffective for not objecting to the officers' testimony. But we don't consider ineffective-assistance-of-counsel claims on direct appeal without an adequately developed record. *See United States v. Gonzalez*, 501 F.3d 630, 644 (6th Cir. 2007). Here, we lack information about why Lake's lawyer didn't object to the officer testimony. So, we decline to address Lake's ineffective-assistance claim.

\*     \*     \*

We affirm.